William Prizep v. Commissioner. William Prizep and Lenore Prizep v. Commissioner.
Prizep v. Commissioner
Docket Nos. 51189, 51193.
United States Tax Court
T.C. Memo 1959-56; 1959 Tax Ct. Memo LEXIS 191; 18 T.C.M. (CCH) 274; T.C.M. (RIA) 59056; March 27, 1959
*191 The Commissioner determined deficiencies in income tax and additions to tax for fraud against petitioners for 1942, 1943, 1944, 1945, and 1946. The deficiencies were due to adjustments made by the Commissioner to the income as reported on the returns. There was agreement between the parties as to several of the adjustments thus made. Other adjustments not agreed to remained in dispute and are decided herein. The principal adjustments not agreed to are those of unreported sales for 1943, 1944, and 1945. Held, there were no unreported sales for 1943 and there were substantial amounts of unreported sales for 1944 and 1945, the amounts of which are found herein. Held, further, that parts of the deficiencies for 1944 and 1945 are due to fraud with intent to evade tax. Held, further, that although there will be deficiencies for each of the years 1942, 1943, and 1946, owing to petitioner's agreement to some of the adjustments made by the Commissioner for those years and to our decision against petitioner on some issues for those years, no parts of the deficiencies for 1942, 1943, and 1946 are due to fraud with intent to evade tax. Emile Z. Berman, Esq., *192 and Samuel Becker, Esq., for the petitioners. John J. Madden, Esq., and Herbert Rothenberg, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income tax and additions thereto for fraud under section 293(b), Internal Revenue Code of 1939, [1] as follows: Additions to Tax
Year
Income Tax
Sec. 293(b)
Docket No. 51189 - William Prizep
1942
$ 5,072.84
$ 2,536.42
1943
110,430.31
55,215.16
1944
194,101.41
97,050.71
Docket No. 51193
William Prizep and Lenore Prizep
1945
849,034.24
424,517.12
1946
1,217.51
608.76
The deficiencies, all of which were placed in issue by the pleadings, are due to the respondent's determination of additional income as follows: *193 Net
Year
Reported
Amount Added
Corrected
1942
$ 3,471.14
$ 15,125.94
$ 18,597.08
1943
10,330.93
140,585.22
150,916.15
1944
7,732.71
229,446.96
237,179.67
1945
3,469.50
940,327.42
943,796.92
1946
3,589.45
5,208.80
8,798.25
The additional income is composed of numerous items. Many of these items have been settled or conceded by stipulation. Some of the stipulated items are still in issue for the purposes of determining whether or not there was fraud. The other items still in issue regarding both amount and fraud are as follows: 1942
1943
1944
1945
Unverified
$15,050.00 [1]
$21,538.50 [1]
loans &
exchanges acct.
Bank deposits &
69,348.94
bond purchases
Unreported
9,799.84 [1]
$228,010.58 [2]
$935,429.17 [2]
sales
*194 For the year 1946 the only item in issue is certain gross rental income in the amount of $3,300 added by the Commissioner. Petitioner concedes that the gross rental income is includible but contends it is offset by deductible depreciation and expenses which were not previously claimed. The respondent by amendments to his answer asserts that if his determination of deficiencies as set out in the deficiency notices is not upheld then, in the alternative, the petitioners had unreported income as computed by the net worth method resulting in deficiencies and additions thereto as follows: Additions
Unreported
Deficiencies in
to Tax
Year
Income
Income Tax
Sec. 293(b)
1943
$ 59,995.48
$ 40,628.09
$20,314.05
1944
68,983.22
46,876.50
23,438.25
1945
153,339.46
119,163.49
59,581.75
1946
31,511.70
14,102.69
7,051.35
Findings of Fact Some of the facts have been stipulated; they are incorporated herein by this reference. General Petitioner William Prizep, hereinafter referred to as Prizep or petitioner, and Lenore Prizep, hereinafter referred to as Lenore, husband and wife and now legally known as William Dean and Lenore Dean, reside *195 at 40 Maple Street, Brooklyn, New York, and filed individual income tax returns as follows: Collector of
Year
Taxpayer
Internal Revenue
1942
Prizep
First Dist. of N. Y.
1943
Prizep
Third Dist. of N. Y.
1944
Prizep
Third Dist. of N. Y.
1945
Prizep and Lenore
Third Dist. of N. Y.
1946
Prizep and Lenore
Third Dist. of N. Y.
Family, Education, and Business Experience Prizep was born abroad in 1904 and came to this country at the age of 1 year. Lenore was born in 1905. Prizep was married in 1926 to Lenore. Prizep and Lenore have two daughters, Gloria and Carolyn, born in 1930 and 1933, respectively. Prizep attended public schools in New York City through the first year of high school when he was 15 years old. He then became employed as a salesman and window trimmer for a silk store in the Bronx. After staying in that job for a couple of years and after a few odd jobs he became employed as a salesman for the Harold Silk Shop, also known as Bernstein & Marcus, around 1923 or 1924 at a salary of about $45 per week. After a few years he became a piece goods buyer for the same firm at a salary of about $65 per week. Around 1930-1931, Prizep left Harold *196 Silk Shop and was employed by Times Square Silk Shop at a salary of about $100 per week. Paramount Fabrics On August 11, 1931, Prizep, Abe Shultz, and Al Topp, both of whom he had known from his employment at Harold Silk Shop, formed a partnership known as Paramount Fabrics Co., hereinafter referred to as Paramount, to engage in the business of jobbing piece goods, i.e., buying piece goods in bolts and smaller cuts and selling the same to the dress, cloak, and suit trade. The partnership agreement stated that Topp and Shultz contributed capital of $4,000 and $3,000, respectively, and that Prizep was "to procure a loan of $2,000.00 for the said partnership, to be returned to the lender within thirty (30) days by the partnership." Prizep never procured the $2,000 loan for the partnership. The agreement also provided that the partners share profits and losses equally and that each partner draw a salary of $85 per week. In 1937, Abe Shultz withdrew from the partnership and a new partnership was formed under the same name. The capital contributions at that time were: Al Topp, $20,580.24 and Prizep, $9,419.76, which represented their respective capital accounts in the predecessor *197 partnership. On June 2, 1942, a new partnership agreement was entered into under the same name. The capital contributions at that time were: Al Topp, $18,130.77 and Prizep, $7,078.49, which represented their capital accounts in the predecessor partnership. Each partner was to draw $50 per week as salary. The partnership was terminated on October 31, 1943, and at all pertinent times thereafter Prizep operated Paramount as a sole proprietor. Paramount conducted its business at 125 West 37th Street, New York City, which is in the "garment district." The premises consisted of a store floor of 1,600 square feet reached by ascending five steps from the street level and a mezzanine floor of the same size reached by a stairway in the rear of the store. In the front of the store was a large counter for cutting piece goods and laying out order. Behind the counter was a desk with telephones and pads for taking orders. The rest of the store floor contained shelves to hold the bolts of goods. The mezzanine also contained shelves for inventory and in the front portion facing the street was a partitioned-off room which was used as an office. Paramount usually employed a bookkeeper, who worked *198 in the second floor office where the books and records were kept, and a delivery and general utility man. Prizep, being an experienced buyer, did most of the buying and also helped the other partners with the selling. In August 1942, Topp entered the United States Army and did not thereafter actively render services to Paramount. However, from April or May of 1943 until the partnership was terminated (on October 31, 1943), Topp would occasionally visit Prizep at home on weekends while he was on leave from Fort Dix, New Jersey, and would discuss business affairs. From the time Topp went into the Army until the partnership was terminated Topp drew $75 per week. After Topp went into the Army Prizep did all the buying and selling for Paramount and managed all of its affairs. Paramount maintained a complete set of double entry books consisting of a general ledger, general journal, purchase journal, sales journal, petty cash book, cash receipts and disbursements book, and payroll journal. An accrual method was employed. While a partnership, a fiscal year ending July 31 was used and after the partnership was terminated, a calendar year was used. After Topp went into the Army Prizep *199 stayed at the desk on the main floor and conducted the business of Paramount. When goods were purchased, Prizep would inspect the incoming goods and place the invoice in a folder. When a sale was made under Paramount's name, Prizep would make out an invoice in triplicate on the billing machine. One copy would go to the customer, one copy would be delivered with the goods for the customer's signature on receipt, and the third copy would be placed in a folder. The sales invoices were consecutively numbered for internal control purposes. Most of the sales made under Paramount's name were made on certain credit terms with payment due within 10 or 30 days and a certain discount for prompt payment. The customer usually paid by check. Occasionally Paramount required cash on delivery. These latter transactions were denominated "cash sales" on the books even though payment was by check. Paramount also made other "cash sales" for nominal amounts which were paid in currency. Prizep would place the checks and currency in a folder. These folders would be turned over to the bookkeeper daily. He would record the transactions in the books of account, prepare deposit slips for receipts, and deposit *200 the receipts in the bank. From about November 1942 until sometime in 1947, Barnet Kaplan was employed as the bookkeeper for Paramount. Kaplan performed his work in the office on the mezzanine floor. Kaplan made all of the entries in the books of account except for the closing, opening, and adjusting entries. These latter entries were made by a firm of certified public accountants that Paramount hired. The accounting firm audited Paramount's books (the extent and scope of the audits are not shown by the record), prepared financial statements, and prepared the partnership and individual returns. Facts Relating to Years in Question During the years 1942 to 1946, Prizep, as noted above, was either a partner in, or sole proprietor of, Paramount. Also, during a part of 1946 he was employed by Junior Miss Dress Co. to find sources where Junior Miss could purchase textile goods, at a salary of $200 per week. During the years 1942 to 1946, neither Lenore nor her daughters were gainfully employed or engaged in any business except that Lenore, doing business as Town Realty Co., acquired the title to the real property located at 340-344 West 72nd Street, New York, New York, on April 16, 1945, at *201 a purchase price of $645,000, with an investment of $87,567.47. Town Realty's books were kept on Paramount's premises by the same bookkeeper who maintained Paramount's books. For the years in question the tax returns of Paramount (Form 1065 while a partnership) and of petitioners were prepared by Paramount's firm of certified public accountants. Regarding the income of Paramount the returns were prepared in conformity with its books. Regarding the other items the returns were prepared in conformity with information supplied by Prizep. The returns showed the income and deductions of Paramount and petitioners to be as follows (.00 omitted): Paramount
FYE
FYE
8/1/43-
11/1/43-
7/31/42 [1]
7/31/43 [1]
10/31/43 [1]
12/31/43 [2]
Sales
$202,769
$532,320
$154,720
$124,379
Less Returns, Allowances &
Discounts
21,760
34,742
42
5,647
Net Sales
$181,009
$497,577
$154,678
$118,732
Cost of Goods Sold
142,110
448,614
134,193
112,920
Gross Profit
$ 38,898
$ 48,963
$ 20,484
$ 5,812
General Overhead Expenses
29,941
35,668
9,287
7,256
Net Profit (or loss)
$ 8,957
$ 13,295
$ 11,197
$ (1,444)
Share to Prizep
$ 4,478
$ 6,647
$ 5,598
$ (1,444)
*202 Paramount
1944 [2]
1945 [2]
1946 [2]
Sales
Less Returns, Allowances &
Discounts
Net Sales
$237,647
$100,659
$69,980
Cost of Goods Sold
211,509
82,229
60,349
Gross Profit
$ 26,138
$ 18,430
$ 9,630
General Overhead Expenses
16,417
13,000
11,382
Net Profit (or loss)
$ 9,721
$ 5,429
[1,752)
Share to Prizep
$ 9,721
$ 5,429
[1,752)
Prizep and Lenore
1942 [1]
1943 [1]
1944 [1]
1945 [2]
1946 [2]
Income
Paramount
$4,478
$10,801
$9,721
$5,429
[1,752)
Rents
(410)
(6,875)
(4,901)
Interest & dividends
100
316
Town Realty
5,700
7,650
Junior Miss Dress Co.
4,200
Capital Gain (or loss)
(368)
$4,068
$10,801
$9,721
$4,354
$ 5,144
Deductions
597
471
1,988
885
1,554
Net Income
$3,471
$10,330
$7,732
$3,469
$ 3,589
The respondent determined that petitioners had additional income as follows (.00 omitted): 1943
8/1-
11/1-
1942
7/31
10/30
12/31
1944
1945
1946
Paramount
Cash purchases
$ 7,752
$24,455
$ 9,364
$12,337
disallowed
Comm. & Selling
5,153
12,274
4,439
4,002
Exp. disallowed
General Exp.
1,550
2,208
disallowed
Interest Exp.
218
257
134
Unverified loans
15,050
6,450
3,258
11,830
& Exchanges
Unreported Sales
5,291
4,508
$228,010
$935,429
(net)
Total -
$29,724
$45,645
$22,488
$32,678
$228,010
$935,429
Paramount
One-half to
$14,862
$22,822
$11,244
$34,066 [1]
Prizep
Other Income and
deductions: Rental income
152
4,870
$3,577
Medical expense
111
1,291
1,242
disallowed
Unexplained bank
73,548
deposits
Interest income
290
921
1,415
1,651
Taxes
(776)
(1,388)
(1,262)
Total Added
$15,125
$140,585
$229,446
$940,327
$5,208
*203 By virtue of agreements between the parties, which have been filed, the petitioners had unreported income due to the following items which have been settled as follows: 1942
1943
1944
1945
1946
Cash Purchases
$1,988.12
$ 8,820.47
Comm., Sell,
1,726.25
6,727.02
Gen., and Int.
Exp.
Rental Income
152.50
$4,870.50
$3,577.36 [2]
Medical
111.33 [1]
$1,291.45 [1]
442.78
Expense
Interest
290.53
921.38
1,415.77
1,651.31
Income
Taxes
(776.45)
(1,388.02)
(1,262.65)
Agreed
$3,978.20
$15,838.02
$1,436.38
$4,898.25
$4,408.80
Unreported
Income
*204 Unverified Loans and Exchanges Paramount's general ledger contained an account entitled "Loans & Exchanges." The Commissioner determined that certain credits to that account were "unverified loans and exchanges" and represented the receipt of income. The name of the "lender" and the amount of the credits determined to be income are as follows: 1942
1943
Total
L. Lawrence
$ 3,500
$ 3,500.00
S. Schwartz
3,825
3,825.00
L. Louis
7,725
$ 1,400.00
9,125.00
J. Goldberg
250.00
250.00
W. Prizep
9,100.00
9,100.00
Exchange
1,700.00
1,700.00
Lenore Prizep
8,258.25
8,258.25
S. Skolnick
830.25
830.25
$15,050
$21,538.50
$36,588.50
All of the credits except two are represented by a receipt of cash by Paramount. The loans and exchanges account also shows debits indicating a repayment of the "loans." All of the debits except one are represented by a payment of cash (check) by Paramount. The following schedule shows the individual credits and debits to the "Loans & Exchanges" account with notations relating to the entries not representing the receipt or payment of cash and also shows the amount of interest included in the *205 repayment check, and the payee of and endorsement on the check: Loans
Loans
Lender
Date
Credits *
L. Lawrence
8/12/41
$3,500
S. Schwartz
9/18/41
1,000
11/18/41
1,000
12/19/41
600
12/24/41
1,000
12/31/41
225 1a
3,825
L. Louis
12/24/41
2,000
12/31/41
725 1b
1/14/42
5,000
9/10/42
1,400
9,125
J. Goldberg
9/ 8/42
250
Wm. Prizep
11/ 5/42
100
7/30/43
3,000
11/ 5/43
6,000
9,100
Exchange
3/ 5/43
1,700
L. Prizep
8/ 5/43
3,258
12/14/43
5,000
8,258
S. Skolnick
12/10/43
830
Loans
Repayments
Lender
Date
Debits *
Interest
Payee
Endorsements
L. Lawrence
9/30/41
$2,000
$28.57
Check missing
10/29/41
750
7.25
Check missing
2/26/42
750
24.75
Check missing
S. Schwartz
9/26/41
1,000
Cash
Prizep
9/30/41
1,500
34.50
Cash
Topp
10/21/41
1,500
5.25
Cash
Prizep
1/28/42
450 [2]
2.10
Cash
Prizep, Topp
2/10/42
600
4.00
Cash
Prizep
2/16/42
2,000
36.17
Check missing
L. Louis
1/28/42
450 [2]
2.10
Cash
Prizep, Topp
2/12/42
2,000
15.67
Check missing
2/26/42
500
4.67
Check missing
2/26/42
3,000
13.00
Check missing
8/13/42
1,000
L. Louis
L. Louis,
Topp
8/17/42
1,000
L. Louis
L. Louis,
Topp
11/ 4/42
1,400
12.84
Check missing
J. Goldberg
11/14/42
250
Cash
Prizep,
S. Weinberg
Wm. Prizep
7/13/42
120
Check missing
7/21/42
180
Check missing
8/23/43
3,000
12.00
Prizep
Prizep
11/ 9/43
1,000
Prizep
Prizep
11/15/43
5,000 1c
No check
issued
Exchange
3/12/43
1,700
Cash
Prizep
L. Prizep
10/14/43
3,258
Cash
Prizep
12/29/43
5,000
Cash
Prizep,
S. Weisman
S. Skolnick
12/ 9/43
830
S. Skolnick
S. Skolnick
*206 On July 30, 1943, Prizep withdrew $3,000 from his personal account at the Sterling National Bank. Paramount occasionally borrowed funds from the Sterling National Bank. The loans were usually around $10,000 or less and for a period of a few months or less. The following schedule reflects the funds borrowed by Paramount from the Sterling National Bank: Period
Amount
FYE 7/31/42
$26,000
FYE 7/31/43
56,500
8/1/43-10/31/43
10,000
10/1/43-12/31/43
None
1944
5,000
1945
None
1946
None The bank loans are reflected on the books and records of Paramount in accounts different than those which reflect the disputed "Loans & Exchanges." For Paramount's fiscal year ended July 31, 1942, $7,550 *207 of the "unverified loans and exchanges" which was determined by the Commissioner to be income (in the amount of $15,050) constituted income to Paramount. For Paramount's fiscal year ended July 31, 1943, fiscal period ended October 31, 1943, and calendar year ended December 31, 1943, $2,500, $3,258.25, and $5,000, respectively, of the "unverified loans and exchanges," which were determined by the Commissioner to be income (in the respective amounts of $6,450, $3,258.25, and $11,830.25), constituted income to Paramount. Bank Deposits and Bond Purchases During the year 1943, a number of deposits were made in checking and savings accounts in the names of Prizep, Lenore, and their daughters at various banks. In addition, United States savings bonds were purchased in their names. The Commissioner determined that Prizep had additional "other income" in the amount of $73,548.94. By stipulation this amount has been reduced to $69,348.94 and this amount represents the aforementioned bank deposits and bond purchases. The following schedule reflects the status of the bank accounts, the bond purchases, and the amounts determined by the respondent to represent income for the year 1943 (. *208 00 omitted except as shown): Bal.
Deposits - 1943 [1]
Name of Account
1/1
No.
Cash
Check
Kings Co. Sav. Bank
Lenore
$ 398
Gloria
30
$2,162
0
Bowery Savings Bank
Lenore I/T/F *
Gloria
1,679
4
2,787
0
Lenore I/T/F
Carolyn
1,679
5
2,787
0
Lenore
0
1
1,000
0
Greenwich Sav. Bank
Prizep
5
15
5,030
$ 1,970
Lenore
0
1
1,000
0
Lenore I/T/F
Gloria
0
1
3,750
0
Lenore I/T/F
Carolyn
0
1
3,750
0
East N. Y. Sav. Bank
Carolyn
53 [2]
8
2,213
0
Lenore I/T/F
Carolyn
1,465
1
500
0
Lenore I/T/F
Gloria
0
1
650
0
Bank of Manhattan Co.
Lenore personal
checking [2]
0
3
3,000
0
Sterling Nat. Bank
Prizep personal
checking acct.
507
42
3,150
21,706
Total Deposits
Bond Purchases
17
Total Added to Income
Interest
& other
With-
Bal.
Name of Account
Total
Deposits
drawals
12/31
Kings Co. Sav. Bank
Lenore
$ 7,037.25
$ 23.61
0
$7,459
Gloria
2,162.00
164.12
0
2,356
Bowery Savings Bank
Lenore I/T/F *
Gloria
2,787.50
15.09
0
4,482
Lenore I/T/F
Carolyn
2,787.50
15.09
0
4,482
Lenore
1,000.00
0
0
1,000
Greenwich Sav. Bank
Prizep
7,000.00
5.43
$ 6,300
710
Lenore
1,000.00
9.04
0
1,009
Lenore I/T/F
Gloria
3,750.00
33.94
0
3,783
Lenore I/T/F
Carolyn
3,750.00
33.94
0
3,783
East N. Y. Sav. Bank
Carolyn
2,287.52
12.79
0
2,353
Lenore I/T/F
Carolyn
500.00
35.36
0
2,000
Lenore I/T/F
Gloria
650.00
3.25
0
653
Bank of Manhattan Co.
Lenore personal
checking [2]
3,112.19 [3]
0
0
3,000
Sterling Nat. Bank
Prizep personal
checking acct.
24,856.23
0
25,252
110
Total Deposits
$62,680.19
Bond Purchases
6,668.75
Total Added to Income
$69,348.94
*209 The books of Paramount show that Prizep withdrew as salary and drawings the following amounts from Paramount: FYE 7/31/43
$ 3,997.04 *
FP 8/1/43-10/31/43
1,602.85
Period 11/1/43-12/31/43
6,046.20
Total
$11,646.09
Of the $69,348.34 of bank deposits and bond purchases determined by the Commissioner to be income, the amount of $33,400 represents income to petitioner. Unreported Sales During World War II and particularly during 1943, 1944, and 1945, there was a shortage of textile goods. Textile mills, in general, tried to allocate the available production among their good accounts. The tight market caused an increase in the number of so-called "free-lance salesmen" [2] in the *210 trade. Garment manufacturers were anxious to secure goods regardless of who the seller was and were willing to pay prices in excess of the ceiling prices established by Government regulations. Some, through good contacts, were able to secure goods which they held out for sale. Some free-lance salesmen, particularly during 1943 to 1945, used to congregate at Paramount talking shop, playing cards, etc. Included among them was one Sam Kohn. Kohn became acquainted with Prizep around 1930 when Kohn worked for a dress house which did business with Harold Silk Shop, Prizep's employer. During 1942, when Kohn started to frequent Paramount, and 1943 Kohn would secure "swatches" from Prizep and try to sell some goods for him. He did make a number of sales. These sales were billed to the customers *211 by Paramount and Kohn received a commission of 2 per centum. These transactions were correctly reflected on Paramount's books. The books and records of Paramount reflect the commissions-paid expense as follows: 1942
$ 3,818
1943
14,346
1944
1945
To some extent these amounts (1942 and 1943) include amounts in excess of ceiling prices which Paramount paid for goods and included in commission expense. Prizep had encountered some difficulties with the Office of Price Administration in 1943 for including these overages in his selling price but the dispute was settled. In the latter part of 1943 or early 1944, Kohn had invoices printed with fictitious names and addresses (of the seller) on the billhead as follows: R. Jacobs, Rayons & Cottons, 141 West 40th Street, New York 18, N. Y. S. A. Coburn, Fabrics, 110 West 40th Street, New York 18, N. Y. M. E. Smith, Novelty & Rayon Fabrics, 1265 Broadway, New York 1, N. Y. H. Gross, Plain and Novelty Fabrics, 1225 Broadway, New York, N. Y. J. M. Berman, Plain and Novelty Fabrics, 1239 Broadway, New York, N. Y.
Kohn continued a free-lance salesman but when he sold goods he would bill the goods to the buyer under *212 one of the fictitious invoices rather than use an invoice containing the true seller's name. He would prepare the invoice (the buyer's name and address, the quantity and type of material, and the amount) either in his own handwriting or have it typed by Kaplan, Paramount's bookkeeper, or a girl typist at a dress house on 36th Street. The goods would usually be delivered by Myles, Paramount's utility and delivery man. Kohn would pay the typists and delivery man nominal amounts for helping him. Within a short time, usually a day or two, after the goods were delivered Kohn would visit the purchaser and receive a check made payable to the fictitious name on the billhead of the invoice in the amount thereof. Kohn would then endorse the check with the fictitious payee's name and would usually cash it at the City Check Cashing Service, 41st Street and Broadway, New York City. Kohn also cashed some of the checks at the Sam Waldman Check Cashing Service and the F. & B. Corporation. Kohn made certain of the aforementioned sales under fictitious invoices for Paramount. When the sales were made for Paramount, Kohn would put the money which he collected from cashing the checks in an envelope and *213 turn it over to Prizep when he returned to the place of business of Paramount. Prizep would then write on a piece of paper the amount of money turned over to him by Kohn and at the end of the week he would add up the amounts thus received and pay Kohn a commission of 1 per cent on the amounts thus totaled. In the year 1944, sales of goods were thus made by Kohn for Paramount which totaled $80,026.80 and in the year 1945, Kohn sold in the same manner, $470,731.35 of goods for Paramount, using fictitious names on the invoices as sellers of the merchandise. The foregoing amount of $470,731.35, sales made by Kohn in 1945 for Paramount, included sales amounting to the sum of $69,460.98 made to the Junior Miss Dress Co., a dress manufacturing concern in New York City. This latter amount is shown by respondent's exhibit FFF which Jack Stolkin, a partner in Junior Miss Dress Co. had prepared under his direction from the books and records of Junior Miss Dress Co. In none of these sales made by Kohn in 1944 and 1945 did the name of Paramount appear on the invoices as the seller of the goods. The seller of the goods appeared as one or the other of the fictitious names which Kohn used on the *214 invoices which he had had printed at his own expense. The sales which were thus made by Kohn for Paramount in 1944 and 1945 amounting to $80,026.80 and $470,731.35, respectively, were not recorded on the books of Paramount and were not reported by petitioner in his returns for 1944 and 1945. There were no unreported sales for 1943. Kohn sold goods for persons other than Paramount, using the same invoices with fictitious names. During the year 1944, Kohn earned commissions totaling approximately $250 by making approximately 8 or 10 sales of gauze for Harry E. Rubin Fabrics Co., 222 West 37th Street. This gauze was billed under Rubin's invoices and payment was made directly to Rubin. During this period, 1944 and 1945, Kohn offered for sale and sold fictitious invoices without the delivery of merchandise. During this same period there were others selling goods or invoices using the same fictitious names on invoices as those used by Kohn. Cost of Goods Sold The Commissioner, in his determination of the deficiencies for 1943, 1944, and 1945, added to the net income reported on petitioner's returns for those years unreported sales as follows: 1943
$ 9,800.44
1944
228,010.58 *
1945
935,429.17 *
*215 The Commissioner in such determination did not allow Prizep any cost of goods sold in computing gross income from such sales. The following tabulation shows for the periods specified the net sales, the cost of sales, the gross profit (net sales less cost of sales), the gross profit rate expressed as a percentage of sales, and the composite gross profit rate for all the periods, according to the books and income tax returns of the business: Gross Profit Ratios
1942 - 1945
Cost
Gross
Gross
Period
Net Sales
of Sales
Profit
Profit
Rate
Aug. 1, 1941-July 31, 1942
$ 181,009.79
$ 142,110.87
$ 38,898.92
21.49%
Aug. 1, 1942-July 31, 1943
497,577.95
448,614.23
48,963.72
9.84%
Aug. 1, 1943-Oct. 31, 1943
154,678.61
134,193.64
20,484.97
13.24%
Nov. 1, 1943-Dec. 31, 1943
118,732.54
112,920.31
5,812.23
4.90%
Year 1944
237,647.90
211,509.17
26,138.73
11.00%
Year 1945
100,659.61
82,229.39
18,430.22
18.31%
Composite Total All Periods
$1,290,306.40
$1,131,577.61
$158,728.79
12.30%
*216 We find from all the evidence that Prizep's gross profit on the unreported sales for 1944 was 12 per cent Thus, his cost of goods sold of the $80,026.80 unreported sales for that year was $70,423.58. His gross profit on the unreported sales for 1945 was 19 per cent. Thus, his cost of goods sold of the $470,731.35 unreported sales for that year was $381,393.39. The foregoing amounts of Prizep's cost of goods sold on the unreported sales for 1944 and 1945 include any commissions which Prizep paid to Kohn and any check cashing fees which may have been paid to the check cashing agencies which cashed the checks. Sales of Oneida Fabrics Co. Prizep operated a partnership under the name of Oneida Fabrics Co. with Henry W. Jacobs in the latter part of 1944 and 1945. The business was operated on the premises of Paramount. The merchandise was purchased under the name of Paramount and the purchases were recorded on the books of Paramount. The inventory was stored at and delivered to customers from Paramount. This merchandise was sold under Oneida Fabrics Co. invoices and Paramount was accordingly reimbursed. Prizep personally kept the records of the Oneida transactions. Prizep's share *217 of Oneida's profits was recorded on Paramount's books as commissions earned. The "Commission Earned" account on Paramount's books reflects credit entries as follows: Date
Amount
October 31, 1944
$ 560.90
November 10
304.40
December 21
283.80
$1,149.10
January 19, 1945
$ 486.64
January 29
320.37
February 1
233.73
February 13
411.91
February 26
1,431.00
February 26
376.17
March 13
320.32
March 13
548.96
April 30
358.87
April 30
267.35
June 25
1,989.12
August 24
2,094.76
$8,839.20
January 7, 1946
$1,202.76
Rental Income In 1944, Prizep and Lenore negotiated with Timms & Behrens, real estate brokers, for the purchase of 36-40 Maple Street, Brooklyn, which was owned by the Seamen's Bank for Savings. The premises consisted of a 100feet x 120feet lot with a residence and extension porch which was used as a doctor's office. Prior to October 16, 1944, Lenore entered into a contract as purchaser of this property; however, the sale was not consummated. On October 16, 1944, a contract of sale for this property was signed in the name of "Rita Schaffer" as purchaser providing for a purchase price of $28,500, $2,000 down and $26,500 on *218 the delivery of the deed. Rita Schaffer was Lenore's mother and was also known as Rebecca Wolsky. Pursuant to the contract a deed dated November 8, 1944, conveyed the property from the Seamen's Bank to Rita Schaffer. Another deed dated November 8, 1944, was executed conveying the same property from Rita Schaffer to Lenore. The deed from the bank to Rita Schaffer was recorded on November 9, 1944. The deed from Rita Schaffer to Lenore was not recorded until April 2, 1946. After the house was purchased Prizep and Lenore hired a number of firms and persons to repair and improve the premises by partitioning the house, adding a room, and making it into a 2-family house. All of the firms and persons doing the work negotiated with Prizep and were hired and paid by him. The purchase price of the house was $28,500 and improvements in the amounts of $1,023.15 and $25,932.40 were made in 1945 and 1946, respectively. In the early fall of 1945, Stephen Klein, president of Barton's Candy Corporation, noticed a sign on the house situated at 36-40 Maple Street, Brooklyn, indicating that said premises were for rent. In accordance with the advertisement Klein contacted the petitioners and negotiated *219 solely with petitioners for the rental of said house. He was advised that the building was to be partitioned and only a portion of it would be rented to Klein. When Klein received his lease he noticed that it was signed by Rita Schaffer. Klein was advised by petitioners that this was only a temporary arrangement. Prior to April 1946, the petitioners instructed Klein to make all checks payable to Rita Schaffer. All checks were mailed to Paramount and all correspondence in connection with the property was from Paramount and signed by Prizep. These checks were generally endorsed by Rita Schaffer and either one of the two petitioners. After April 1946, Prizep instructed Klein to make all future checks payable to Lenore. Klein paid rent of $3,300 for 1946. Petitioners did not include this amount in their return for that year. Respondent added the $3,300 rent to petitioner's income and also allowed a deduction (not previously claimed) in the amount of $1,262.65 for taxes on the property in 1946. Petitioners paid for and owned the house and improvements at 36-40 Maple Street and the $3,300 rent which Klein paid was their property and income. Petitioners paid for repairs and incurred depreciation *220 on the portion of the house held for rental purposes in the amount of $1,500 for the year 1946. Fraud A part of the deficiency in income tax for each of the years 1944 and 1945 is due to fraud with intent to evade tax. No part of the deficiency in income tax for each of the years 1942, 1943, and 1946 is due to fraud with intent to evade tax. Opinion BLACK, Judge: Respondent in his brief submits that our Court should decide this case on the basis of the specific adjustments which respondent has made in his deficiency notices. However, he contends that in the event the unreported income under the specific adjustments does not equal or exceed the unreported income under the net worth method, then the net worth method should be employed in determining the amount of the deficiencies. It is our opinion that we should decide this case on the issues raised by the pleadings as to the various adjustments made by respondent in his deficiency notices to the net income as reported by petitioners on their returns. Many of these adjustments have been settled by the parties and their agreements will be given effect in recomputations under Rule 50. For example, one of the very substantial *221 adjustments which respondent made to the net income as reported by Prizep on his returns for 1942 and 1943 was to add to income alleged overstatements of purchases. After very considerable evidence had been received at the hearing in New York City on this issue, a settlement was agreed to by the parties as to this issue whereby respondent conceded error as to a substantial amount of this adjustment. Prizep agreed that the remainder of the adjustments for purchases overstated, not conceded as error by respondent, should remain as determined by respondent. Respondent agreed that no fraud should be attributed to Prizep on account of the overstated purchases which he admitted should be added to his income. After the foregoing agreement was made as to the "overstatement of purchases" issue, there still remained other issues not agreed upon, notably the issue as to unreported sales for 1943, 1944, and 1945. These alleged unreported sales ran into large sums of money and a great deal of evidence was received from both sides on this issue. After having heard and considered the evidence as to these unreported sales and other issues which remained in the case, and having made Findings of Fact *222 as to these issues, we see no reason why we should take up and decide this case on respondent's alternative contention based on the net worth method. Manifestly, where, as here, the amount of income under one method differs from the amount under the other, we cannot use both methods in deciding the case. We must choose one or the other. The request that we decide the case on the basis of specific adjustments made by respondent in his determination of the deficiencies unless, in doing so, the deficiencies are less than they would be if we should decide the case under the net worth method is, to say the least, an unusual request. We decline to grant it. We endeavor to adjudicate the issues which are submitted to us for decision on the facts and on the law regardless of the result to the taxpayer or to the internal revenue service. Due to the numerous items already agreed upon by the parties in the instant case and to our decision on the issues which are still in dispute, it is certain that there will be deficiencies in tax for all the taxable years before us and additions to tax because of our findings of fraud for the years 1944 and 1945. We do not know what the deficiencies, including *223 additions to tax, will be until there is a recomputation under Rule 50. Yet respondent, in effect, would have us make some kind of an estimate; if we came to the conclusion that the deficiencies would be less under our holdings on the adjustment method used by respondent in his deficiency notices than they would be under respondent's net worth computation, he would have us, in effect, scrap what we have already done and take up the case and decide it under the net worth method. We know of no warrant for that kind of procedure in the Tax Court and we shall not follow it here. We have made no Findings of Fact on the net worth method urged by respondent as an alternative in the manner aforesaid. To do so would serve no useful purpose and would only prolong unduly this report. For reasons we have already indicated, we think this case should be decided on the issues raised as to the adjustments made by the Commissioner in his deficiency notices and which still remain in dispute, after the elimination of other issues which have been settled by agreement between the parties. We shall now take up the issues which remain in dispute and discuss them in their order. Unverified Loans and *224 Exchanges Paramount's books contain an account entitled "Loans & Exchanges." The account contains certain credit entries which reflect the receipt of cash and certain offsetting entries which reflect the payment of cash. Both parties agree that the cash was received and disbursed. The books indicate that the cash was received from a lender and that it was repaid to the lender. Respondent, however, has determined that cash received represented income rather than borrowings. Respondent contends that the names of the lenders were fictitious and that the cash supposedly representing the repayments was received by Prizep rather than the purported lender. We have carefully considered all the facts in the record on this issue and we think that petitioner has shown that some portion of the "unverified loans and exchanges" represents actual loans and not income. However, the record does not permit of a precise determination. In these circumstances, we have used our best judgment and we have found that for Paramount's fiscal year ended July 31, 1942, $7,550 of the "unverified loans and exchanges" constituted income to Paramount. Cf. Cohan v. Commissioner, 39 Fed. (2d) 540, 544 *225 (C.A. 2, 1930). For Paramount's fiscal year ended July 31, 1943, fiscal period ended October 31, 1943, and calendar year ended December 31, 1943, we have found that $2,500, $3,258.25, and $5,000, respectively, of the unverified loans and exchanges which were determined by the Commissioner to be income (in the respective amounts of $6,450, $3,258.25, and $11,830.25) constituted income to Paramount. Bank Deposits and Bond Purchases Regarding the second specific item in controversy, "unexplained bank deposits and bonds purchased," it is agreed that during 1943 deposits in the amount of $62,680.19 were made in certain bank accounts of petitioner, his wife, and children, and that United States savings bonds in the amount of $6,668.75 were purchased in their names. It is fully recognized that bank deposits or the receipt of cash do not in and of themselves represent income. But here the Commissioner has determined that the deposits and bond purchases represent income. In these circumstances, the petitioner has the burden of showing that these amounts do not represent the receipt of unreported income, Hague Estate v. Commissioner, 132 Fed. (2d) 775 (C.A. 2, 1943), affirming *226 45 B.T.A. 104 (1941). Sometimes, after the lapse of several years, that is a difficult thing for a taxpayer to do. After a consideration of all the evidence in the record concerning this issue as to bank deposits and bond purchases, we have made a finding of fact that "[of] the $69,348.34 of bank deposits and bond purchases determined by the Commissioner to be income, the amount of $33,400 represents income to petitioner," and should be included in his income for the year 1943. That finding of fact disposes of this issue. Unreported Sales The third issue which we must decide is unreported sales for 1943, 1944, and 1945. The parties agree that during 1944 and 1945 Sam Kohn, a so-called free-lance salesman, sold substantial quantities of textile materials; that Kohn billed the purchasers on invoices bearing fictitious billheads, such as J. M. Berman, H. Gross, R. Jacobs, S. A. Coburn, and M. E. Smith; that the purchasers paid for these goods by check made payable to the name on the fictitious billhead; and that Kohn endorsed these checks with the fictitious payee's name and cashed them at certain check cashing agencies. The respondent determined that Paramount *227 had unreported sales in the amounts of $9,799.84, $231,442.83, and $949,420.29 for the years 1943, 1944, and 1945, respectively, and contends that these amounts represent sales made by Kohn on behalf of petitioner and not recorded on Paramount's books. Petitioner, on the other hand, denies that Kohn made any sales for Paramount subsequent to 1943 and contends that all of Paramount's sales for 1943, 1944, and 1945 are recorded on its books. Prizep testified that all of the sales of Paramount were recorded on its books and that Kohn did not make any sales for him under fictitious invoices. Kohn, who is dead and whose deposition was taken prior to his death, testified that he made numerous sales for Paramount which were billed on the fictitious invoices and that all of the customers knew that he was representing Paramount. It is clear that Kohn was the type of man whose testimony must be viewed with caution. In his testimony given in his deposition he conceded, on cross-examination, that during 1943 and 1944 he sold invoices to certain individuals where no goods at all were delivered to the alleged purchasers, to enable them to escape the regulations of the Office of Price Administration. *228 He made no contention that petitioner had anything to do with these particular transactions. He himself admitted that they were disreputable and said that he was sorry that he had anything to do with them. If Kohn's testimony was the only evidence that these alleged unreported sales were made, we would have great hesitancy, in view of the testimony of petitioner, in sustaining any part of respondent's determination as to these unreported sales. However, there is much testimony in the record, oral and documentary, which, we think corroborates Kohn as to some of the alleged sales made in 1944 and 1945 and which were not reported on petitioner's returns for those years. After a careful review of all this evidence, we have made findings that in 1944 Kohn made sales for Paramount aggregating $80,026.80 which were not reported on petitioner's return for that year, and that in 1945 he made sales aggregating $470,731.35 for Paramount which petitioner did not report on his return for that year. We have made a finding that there were no unreported sales for the year 1943. In that year Kohn did make some sales for Paramount but, unlike in 1944 and 1945, these sales were invoiced in Paramount's *229 name, no fictitious names were used, Kohn was paid a commission of 2 per cent for the sales which he made, and we are convinced that these sales were reflected in petitioner's books and were reported on petitioner's return for 1943. Respondent's determination that petitioner had unreported sales of $9,799.84 in 1943 is not sustained. Cost of Goods Sold Notwithstanding the Commissioner has added to the net income reported on petitioner's return for 1944 the sum of $228,010.58 as unreported sales and has added to the net income reported by petitioner on his return for 1945 the sum of $935,429.17 as unreported sales, he has allowed petitioner nothing for cost of goods sold with respect to these alleged unreported sales. Manifestly, this would result in a great distortion of petitioner's net income. It seems certain he was not getting these goods for nothing. The cost of goods sold is not a deduction and to make an allowance for it would not be making the allowance for a deduction. Treasury Regulations 111, section 29.22 (a)-5 reads: "Gross Income From Business. - In the case of a manufacturing, merchandising, or mining business, 'gross income' means the total sales, less the *230 cost of goods sold, plus any income from investments and from incidental or outside operations or sources." * * * The effect of what respondent would have us do is to tax gross receipts as net income. For the year 1944, petitioner reported gross sales of $237,647.90 on his return for that year and that cost of goods sold in that year was $211,509.17. It seems clear to us from the evidence that the cost of goods sold shown in the return was with reference to the gross sales of $237,647.90 shown on the return. We are convinced that the cost of goods sold on the return has nothing to do with the $80,026.80 unreported sales which we have held petitioner had in 1944. For the year 1945, petitioner reported gross sales of $100,659.61 and that cost of goods sold in that year was $82,229.39. It seems clear to us from the evidence that the cost of goods sold shown in the return was with reference to the gross sales of $100,659.61 shown on the return. We are convinced that this cost of goods sold shown on the return has nothing to do with the $470,731.35 unreported sales which we have held petitioner had in 1945. We think there is sufficient evidence in the record for us to make a finding *231 of fact as to the cost of goods sold on these unreported sales for the respective years 1944 and 1945 and we have done so in our Findings of Fact. Those figures should be used in a computation under Rule 50. Rental Income In his deficiency notice respondent added to petitioner's income rentals as follows: 1942
$ 152.50
1945
4,870.50
1946
3,577.36 As disclosed in our Findings of Fact, the parties have settled by agreement the rentals for 1942 and 1945. As to the $3,577.36 which the Commissioner added for 1946, there is no evidence as to $277.36 of it. That much will stand approved for lack of any evidence to disprove the correctness of respondent's determination. As to $3,300 Klein rentals, petitioners concede they received that amount of rentals in 1946 from Klein. However, they contend that they are entitled to deductions for taxes, repairs, and depreciation on the property from which the rents were received, which exceed the amount of rents from the property. Therefore, it is the contention of petitioners that they had no net income from these rentals and that it was error for respondent to add to their net income as shown on their return for 1946, $3,300 *232 as rental from one-half of the 36-40 Maple Street property. It will be noted that respondent, in his deficiency notice, in adding $3,577.36 rental income to petitioners' net income also gave them a deduction of $1,262.65 taxes and explained that this was for taxes on the property which petitioners had not deducted on their return. Petitioners contend that they also are entitled to deductions for repairs and depreciation on the property in question. In our Findings of Fact we found that petitioners paid for repairs and incurred depreciation on the portion of the house held for rental purposes in the amount of $1,500 for the year 1946. A deduction of $1,500 for repairs and depreciation should be allowed petitioners in a computation under Rule 50. Fraud The respondent has determined that the petitioners had substantial amounts of unreported sales for 1944 and 1945. We have held that petitioners did have unreported sales of $80,026.80 for the year 1944 and $470,731.35 for the year 1945. These were sales which we have held were made for Paramount by Sam Kohn but, in invoicing the goods to the buyers, fictitious names other than Paramount were used by Kohn. Petitioner did not report *233 these sales on his returns for 1944 and 1945. This is persuasive evidence of fraud. Arlette Coat Co., 14 T.C. 751, 756 (1950). It is not possible to believe that these large amounts of unreported sales were innocently unreported by petitioner. He must have known about them and, therefore, his failure to report them on his tax returns was a fraudulent intent. We have, therefore, made a finding of fact that part of the deficiencies in each of the years 1944 and 1945 is due to fraud with intent to evade tax. We have not made a similar finding as to the years 1942, 1943, and 1946. We have found no unreported sales for those years. The Commissioner in his determination of the deficiencies did not claim any for the years 1942 and 1946. He did determine that for the year 1943 there were unreported sales of $9,799.84. However, after a careful consideration of all the evidence we have made a finding that there were no unreported sales for 1943. It is true that because of certain conceded unreported income of petitioner which he made at the hearing and in the stipulation of facts which was filed and because of our decision as to the loans and exchanges issue and the bank deposits *234 and bond purchases issue, there will be substantial deficiencies for 1942 and 1943. The burden of proof of showing fraud is, of course, on the respondent. Respondent concedes that fact and does not argue otherwise. After a careful consideration of the facts we do not think that respondent has shown that any of the items of income which petitioner omitted from his return for 1942, 1943, and 1946 was omitted because of fraud with intent to evade tax. We have, therefore, made a finding that no part of the deficiencies for 1942, 1943, and 1946 is due to fraud with intent to evade tax. Respondent's additions to the tax for 1942, 1943, and 1946 are not sustained. Decisions will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1939, as amended.↩
1. These items in whole or in part were determined to be income to Paramount, in which petitioner was an equal partner with one other. To the extent that these amounts were added to partnership income only one-half thereof was added to petitioner's income. ↩
2. Net after reduction by respondent of $3,432.25 and $13,991.12 for respective years for commissions and check cashing fees.↩
1. Partnership return. ↩
2. Schedule C, individual return.↩
1. Separate return. ↩
2. Joint return.↩
1. $22,822.91 plus $11,244.01; i.e., Prizep's share of Paramount's unreported income for the fiscal year ended July 31, 1943, and for the fiscal period ended October 30, 1943, respectively.↩
2. $3,300 of this amount is gross rental income from 36-40 Maple Street. The remaining $277.36 is unidentified and apparently not in issue. Regarding the $3,300 the petitioners concede that it is properly their gross income but contend that they had deductible expenses relating to the rental property in excess of that amount.↩
1. No evidence was introduced and there does not appear to be any dispute regarding these items. ↩
*. .00 omitted ↩
1a. As far as the record shows these amounts do not represent the receipt of cash by Paramount. The concomitant charge is not clearly shown from the entries in the general journal but it appears to be to expense. ↩
1b. As far as the record shows these amounts do not represent the receipt of cash by Paramount. The concomitant charge is not clearly shown from the entries in the general journal but it appears to be to expense. ↩
2. The books show that the one check for $452.10 was for repayment to both S. Schwartz and L. Louis, $225 each, plus interest of $2.10.↩
1c. A journal entry transferring this amount was made to the capital contributions account of Prizep. ↩
1. The total deposits which are known are only broken down between cash and check to the extent that the record shows such breakdown. ↩
*. In Trust For ↩
2. Transferred. ↩
3. The Commissioner added a deposit dated June 25, 1945, in the amount of $112.19 to petitioner's 1943 income. This is obviously an error on respondent's part.↩
*. The record does not show the portion of this amount withdrawn in the calendar year 1942 and the portion withdrawn in the calendar year 1943.↩
2. Free-lance salesmen had no office or place of business but operated out of their "hat." They would act for either a buyer or seller or both on a commission basis or might buy and sell on their own account. They would usually carry with them a "swatch" (small piece of the goods) and would show the swatch to the prospective buyer. The buyer would make his purchase on the basis of the swatch.↩
*. Net after reduction by respondent of $3,432.25 and $13,991.12 for respective years for commissions and check cashing fees.↩