Abe B. Adler, Leona M. Adler v. Commissioner.
Adler v. Comm'r
Docket Nos. 700-66, 844-66. United States Tax Court
T.C. Memo 1968-100; 1968 Tax Ct. Memo LEXIS 197; 27 T.C.M. (CCH) 480; T.C.M. (RIA) 68100; May 28, 1968. Filed *197 James C. Herndon and Joseph S. Donchess, 600 Wick Bldg., Youngstown, Ohio, for the petitioners. Larry L. Nameroff, for the respondent. DAWSON
*198 Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases respondent determined the following income tax deficiencies and additions to tax: Additions to Tax
Sec. 293(b) Sec. 294(d)(2)
Sec. 6653(b)
Year
Deficiency
I.R.C. 1939
I.R.C. 1939
I.R.C. 1954
1950
$ 1,172.08
$ 586.04
1951
17,426.22
8,713.11
1952
14,132.72
7,066.36
$864.05
1953
3,086.88
1,661.20
1954
13,567.78
908.10
$ 6,783.89
1955
7,862.47
3,931.24
1956
3,100.62
1957
18,012.60
15,014.26
1958
12,352.83
9,903.21
1959
10,693.41
1960
4,670.48
1961
4,445.86
1962
2,428.09
For the year 1956 respondent determined an overassessment of $2,288.84. In his answer respondent affirmatively, but alternatively, alleged certain increased deficiencies and additions to tax, based upon a net worth computation, for the taxable years 1950 through 1962. Petitioners filed a motion to strike paragraph 9(a)(4) of respondent's answer. This motion will be discussed in our opinion. Some concessions have been made by the parties and will be given effect in the Rule 50 computations. The issues remaining *199 for decision are: 1. Should petitioners' motion to strike paragraph 9(a)(4) of respondent's answer be granted or denied? 2. Were petitioners on the cash or accrual method of accounting and, if they were on the cash basis, did they change their method of accounting to the accrual basis on January 1, 1959, without the consent of respondent? 3. Did the petitioners understate their taxable income for the years 1950 through 1962 and, if so, what were the correct amounts of the understatements? 4. Was a part of the deficiencies in income tax for each of the years 1950 through 1953 and a part of the underpayments of tax required to be shown on petitioners' income tax returns for each of the years 1954 through 1958 due to fraud with intent to evade tax? 5. Is the assessment of any deficiencies determined for the years 1950 through 1955 barred by the statute of limitations? 6. Are petitioners liable for additions to tax for substantial underestimation of estimated tax for the years 1952 and 1954? Findings of Fact All stipulated facts are found accordingly. Abe B. Adler and Leona M. Adler (herein called petitioners) are husband and wife. Their legal residence at the time they *200 filed the petitions in these proceedings was Youngstown, Ohio. They filed their joint Federal income tax returns for the years 1950 through 1962 with the district director of internal revenue at Cleveland, Ohio. For the years 1956, 1957, and 1958 the petitioners signed consents agreeing that income taxes for those years could be assessed at any time prior to December 31, 1965. Respondent's notice of deficiencies covering such years was sent to petitioners on November 30, 1965. Abe is 75 years of age and Leona is 74. Abe's educational training ended in the eighth grade of public school and Leona completed the sixth grade. Leona had no bookkeeping training and Abe's knowledge of bookkeeping was negligible. During the years here involved the petitioners operated a retail furniture business in Youngstown, Ohio. They started their furniture business in their home at 233 South Portland Avenue, Youngstown, in 1933, from which location they operated their store for 9 years, displaying furniture throughout their home. Later, they began displaying furniture at a Youngstown 482 warehouse, but, with the advent of World War II, it became impossible to take customers to the warehouse utilized *201 for display purposes As a consequence, they rented a storeroom at 1928 Mahoning Avenue from a Youngstown bank for use as a showroom; and, thereafter, operated their furniture business from that location. The store showroom had a basement which was not usable in the furniture business, and a frame dwelling attached to the store building. About 1944, the petitioners purchased the store and frame dwelling. The tenants, who at the time occupied the dwelling, were asked to vacate in order that the petitioners could expand their business. Later an archway was cut from the store into the lower floor of the dwelling. The doors were removed and the dwelling utilized for purposes of displaying additional furniture in some of the rooms of the house and one room was used as an office. In addition, one room of the attached dwelling was used as an office; the kitchen was used to store miscellaneous items, and occasionally utilized by the furniture refinisher and by the employees as a lunch room. The dining room and reception hall were used to display furniture items. The four rooms on the second floor were used to display bedroom furniture. In 1949 or 1950, the petitioners had an addition to *202 the store built as a salesroom for furniture. The only other changes made in the physical layout of the store up to 1962 were platforms built in the front and rear window for furniture display and storage of mattresses underneath. During the period 1950 through 1962, there were no major changes made in the type of merchandise sold by the Adler Furniture Company although styles of furniture changed over the years and the store started carrying television sets in the early 1960's. During the years 1950 through 1962, the employee staff of the store consisted of a full-time or part-time furniture finisher, a part-time office girl, a cleaning girl who came in once a week to clean the store, and the petitioners, who worked on a full-time basis. The daily store routine of Abe began when he ordinarily obtained the previous day's daily receipts from Leona and recorded them in a day book. Abe would then generally unpack furniture, check in and unpack merchandise, make the furniture displays, some sales, and deliveries, and go out on complaint calls, take customers to factory displays of furniture in various cities and purchase merchandise. Leona's duties involved straightening up the *203 store, checking on the condition of furniture to be delivered, waiting on customers and, with the assistance of a part-time office girl, doing all the office work incident to the business. This included receiving and making phone calls, collections, and handling all the accounts, books and records of the business. During the years 1950 through 1962 approximately 80 percent of the store business represented time sales and approximately 20 percent constituted cash sales. The Adlers considered sales in which payment was to be made in 30, 60, or 90 days as "cash" sales rather than "time" sales. About 60 percent of the store sales required ordering the item from the manufacturer or dealer for the customer, and about 40 percent of the sales were made from merchandise on the floor. In a typical transaction involving a sale without a down payment, Abe would prepare a sales invoice listing the merchandise sold to the customer with the price, labor charge for the laying of carpeting, the Ohio sales tax, and the date the order was taken. The merchandise would be checked if it had to be ordered from the manufacturer. The down payment would be subtracted from the total price in the bottom *204 right hand corner and would be marked on a legal pad with the name of the customer, date of payment and amount paid. The terms would be marked in the lower left hand corner of the sales invoice. Cash sales were similarly handled with the cash received being daily entered by Leona on a 3" X 5" pad. At the end of each day Leona would summarize and check the totals accumulated on the daily sales slips, with the entries on the legal pad for that day representing the cash receipts for the day and match it with the actual cash receipts for the day, the money for which was kept in a drawer in the office. Leona would then put the day's receipts in one, two, or three envelopes, mark the date thereon, and give them to Abe who would then take the receipts home and place the funds in a safe at their residence until he made a bank deposit either Sunday night or early during the following week. 483 To determine the amount to deposit, Abe would total the receipts for the week and subtract the expenses paid during the week, a record and detail of which was maintained in the day book, and deposit the difference in the store checking account. The receipts listed on the 3" X 5" pad sheets *205 were later transposed by Abe at the end of each day, or the next day, into the day book kept for each day during the years in issue. On the opposite side of each day's receipts in the day book, Abe recorded the cash expenditures made that day. The part-time office girl, and sometimes Leona, would post the payments received on account from the day book to the credit of the customer. These payments were originally posted directly on the back of the sales invoice, and later, in 1956 or 1957, directly on yellow accounts eceivable cards which had been prepared from the sales records. Upon posting, a checkmark would be placed in the day book opposite the name of the customer given credit for the payment in order to reflect the fact that the payment had been posted. In the event a customer made a subsequent purchase, in some instances a new sales invoice would be prepared; otherwise, the subsequent purchase would be added to the original sales invoice for the customer, especially if the original purchase had not been delivered. Such additions would be added at the bottom or on the edges of the original invoice or the entry made on an additional invoice which would be attached to the original *206 sales invoice. At the time an order was taken for a sale classified as a "time" sale, a payment book would be prepared listing the merchandise purchased, the Ohio sales tax thereon, and once the furniture was delivered, the book would be given or mailed to the customer, and all subsequent payments on account by the customer would also be recorded therein. Any subsequent purchases would be entered in the payment book. When a customer came to the store to make a payment on account and brought the payment book, the amount paid would be marked and subtracted from the prior balance to reach the new balance, with a notation being made of who received the payment. The amount received would also be marked on Leona's 3inch x 5inch pad of cash receipts. No attempts were made to check the outstanding balance shown in the customer's payment book against the unpaid balance reflected on the original sales invoice, or the subsequent accounts receivable cards maintained, unless the customer had forgotten to bring the payment book or requested information of the balance or if an additional purchase was to be entered. In the event the customer forgot to bring his payment book, or mailed in a check *207 without the payment book, Leona would enter the payment on the 3inch x 5inch pad, thus assuring that the customer would get proper credit. The customer would be given or mailed a receipt for the payment and the payment entered on the payment book at a later date. Leona was familiar with most of the accounts and attempted to see to it that all payments were eventually properly reflected in the customer's payment books. Once the customer made the final payment as reflected on the payment book, Leona would check the payments and account balance shown on the back of the sales invoice, or the accounts receivable card maintained after 1956 or 1957, to assure that the balance reflected on the customer's payment book agreed with the balance shown on the sales invoice or account cards. About twice a month the part-time office girl would prepare a list of delinquent accounts. To accomplish this, the employee would go through the sales invoices reflecting an unpaid account and check the invoices for the delivery date which was marked thereon. When the sales invoice indicated that no payment had been made within 30 days after the delivery date, or subsequent payments were missed, the customer's *208 name would be placed on the delinquent list. At the time the order was taken from the customer, a sales invoice would be made out showing the date of the order - or sale if the merchandise was in inventory - the name and address of the customer and a description and sales price of the merchandise ordered or sold. The sales invoice was then filed temporarily in a small metal box maintained on a desk in the office to the left of two three drawer metal upright filing cabinets until the merchandise was delivered or ordered from the manufacturer, received and delivered to the customer. The sales invoce (i.e., sales slips) were initially filed in the front of the small metal box if the merchandise had to be ordered by the petitioners from the factory for the customer. Once the merchandise was ordered, the sales 484 invoices were filed in the back of the box in alphabetical order in the so-called "undelivered merchandise" section. This procedure would be the same for a "cash" or "time" sale. In the event of a "time" sale, when the merchandise was delivered, or ordered, received and delivered to the customer, the sales invoice would be removed from the "undelivered merchandise" in *209 the small metal box and placed alphabetically in the second drawer of the first large three drawer metal upright filing cabinet to the right of the small box, known as the "unpaid" file. If the sale had been for cash, once the furniture was delivered or ordered, received and delivered to the customer, the sales invoice would be taken out of the "undelivered merchandise" file and placed alphabetically in the second drawer of the second three drawer metal upright filing cabinet to the right of the small box, and to the right also of the first three drawer metal filing cabinet, which second file was known as the "paid" file. Although 30, 60, and 90 day accounts were treated by the petitioners as cash sales, the sales invoices in such cases were placed, upon delivery of the merchandise, in the "unpaid" drawer of the first large filing cabinet until paid, when the sales invoice would be removed from the "unpaid" file drawer and placed in the "paid" drawer of the second three drawer filing cabinet. The invoices in the "unpaid" drawer of the first large filing cabinet included unpaid invoices for the current and prior years, since the petitioners' time sales ran for periods up to 18 months, *210 and in some cases even longer. Once the account was paid in full, the sales invoice would be removed from the "unpaid" drawer in the first large filing cabinet and placed in the "paid" drawer of the second large filing cabinet. However, the invoices in the "paid" drawer of the second large three drawer metal filing cabinet contained paid invoices of the current year only since, at the end of each year, the petitioners would check through them for mistakes and after the invoices had been summarized on an adding machine for purposes of having the income tax return prepared, the invoices would be removed, tied together and the bundled paid invoices placed in a box and stored. At the close of each calendar year, Leona would determine the total sales for the year for purposes of transmitting this information to the accountant who prepared their income tax return. To accomplish and determine gross sales for the calendar and taxable year, Leona would first tabulate on an adding machine the total of all sales shown on the sales invoice (or the yellow accounts receivable cards in the later years) dated in that year from the "unpaid" drawer in the first large filing cabinet to the right of *211 the small box; and, then tabulate the sales invoices in the "paid" drawer of the second three drawer metal file, including invoices dated during that year and excluding sales invoices which were dated during any prior year. The total of the entire adding machine tape represented the total amount of sales determined for that particular taxable year. The tape, due to the erroneous procedure followed, failed to include sales invoices dated in a prior year, but where merchandise was delivered in the subsequent calendar and taxable year. The tape included, however, all invoices dated during the year - including accounts reflecting unpaid balances for the year. Then, Leona would add up on the adding machine tape, the amount of invoices for all merchandise purchased for the year from the purchase invoices which were also filed alphabetically in one of the large filing cabinets. The list of purchases would include purchased merchandise whether paid for by the petitioners, or not, at the end of the year for which the tabulation was being made. Next, Leona would determine the business expenditures for the year by summarizing the petty cash payments for the year, which amounts were recorded *212 daily in the day book maintained for each year, and by reviewing the check stubs for the year and tabulating the expenditures made by check which related to the business. Then, with the assistance of Leona, Abe would prepare a summary sheet which was blocked off to accommodate the various categories of business items. Leona would read off the various totals from the tapes and slips she had prepared totaling each category of deductible items and Abe would write the amounts in separate blocks on the summary sheet. The only items on the summary sheet not taken from Leona's tapes were dividends and interest. At the time of the hearing the only original available adding machine tape tabulated by Leona was the sales tabulation for the 485 year 1957, which the petitioners' accountant found in the files after the examination of the petitioners' returns was commenced. Using the year 1957 as an example, Leona tabulated the sales, listing the sales invoices dated during 1957, as detailed hereinbefore, on the adding machine tape, and then reduced the gross sales figure as summarized for the year 1957 by the labor expense incurred by petitioners for laying carpeting sold to customers - *213 for the year 1957, in the amount of $3,754.73 - and also show the same expenditure as an expense on the summary sheet used to prepare the income tax returns. The carpet laying expense for the particular taxable year was obtained by Leona from the check stubs for each year. The petitioners' manner of keeping records involved a consistent pattern of single entry bookkeeping, involving sales invoices, purchase invoices, check books and stubs, account cards, day books and petty cash disbursements which were kept in the regular and ordinary course of their business during the period from 1950 through 1958. In order to determine the inventory of the store at yearend for each of the years 1950 through 1962, Leona and Abe would take a large yellow tablet and, starting from the front of the store, would inventory each item of merchandise on hand and mark it down on the pad along with its cost which was usually written in code on the sales tag attached to the furniture. In the event the sales tag did not contain the cost price, Leona would later obtain the cost from the applicable purchase invoices. Petitioners are entitled to the following deductions, based on the bank deposits computation, *214 for Ohio sales tax paid: Year
Amount
1950
$ 1,123.50
1951
1,075.00
1952
1,380.50
1953
3,784.50
1954
4,048.50
1955
4,628.60
1956
5,213.05
1957
4,260.04
1958
2,983.61
In the early 1950's, Abe, in discussing the manner in which he prepared the Ohio sales tax returns with someone, was told that he was incorrectly reporting the sales tax when the final payment for the goods was made, rather than at the date of sale. He discussed this matter with his attorney and requested the attorney to call the Ohio State sales tax office. In July 1953, an examiner of the Department of Taxation, State of Ohio, conducted a sales tax audit at the store for the period July 1, 1949, through June 30, 1953. In an attempt to determine total sales subject to sales tax, the examiner reviewed all the sales invoices for the period of the audit. However, when the total was less than the sales figures shown on the Federal tax returns for such period, the assessment notice was prepared on the basis of the sales in the Federal income tax returns. In 1954 the petitioners paid sales tax in the amount of $11,023.61, based upon deficiencies determined by the Ohio Department *215 of Taxation, as follows: Year
Amount
1949
$ 779.65
1950
3,039.88
1951
3,685.57
1952
2,401.20
1953
1,117.31
Abe made out the sales tax returns based on the receipt forms he received from the State of Ohio when he purchased tax stamps and from information furnished by Leona. The Ohio sales tax returns were prepared and signed by Abe and filed with the Ohio Department of Taxation. They reflected: Taxable Period
Date Filed
Gross Sales
Jan. 1, 1957 to June 30, 1957
July 1, 1957
$69,934.65
July 1, 1957 to Dec. 31, 1957
Jan. 28, 1958
75,437.66
The Ohio State personal property tax returns were prepared for the petitioners by a friend, John Hura, who lived nearby and was employed in the personal property tax department in Youngstown. Hura would compile the return, bring it to the petitioners' store to obtain Abe's signature, and the return would then be filed. The County Return of Taxable Property for 1956, State of Ohio, Mahoning County, signed by Abe on June 26, 1957, showed the amount of net sales for each month of 1956 and total sales for 1956 of $180,449.44. On June 8, 1953, lightning struck the store building *216 in which petitioners operated their furniture store. A part of the chimney collapsed breaking a hole in the roof and caused a fire in the attic where the petitioners stored their old records in cartons. A claim for damages resulting from the lightning and fire was, at the time, submitted to their insurance agent. As a result of the lightning, a portion of the stored records were scorched, burned, soaked and covered with soot and were discarded at the direction of the 486 petitioners by the cleaning girl and the furniture refinisher. Thereafter, the records when removed from the office for storage were placed in the basement of the store, or in the kitchen part of the dwelling building in which the office was located. Subsequently, part of the records stored in the store basement were discarded by a cleaning girl. In 1955 rats destroyed the records stored in the basement after the lightning damage to the dwelling attic. As a result, the records had to be discarded. John Rogan, a certified public accountant and former internal revenue agent, was first employed by petitioners as their accountant in 1954 to prepare their 1953 Federal income tax return and has continued to handle *217 their Federal income tax work since that date. From 1953 to June 8, 1959, the only returns he prepared for them were their Federal income tax returns. From 1959 and subsequently, he prepared and filed all Federal and State tax returns required to be filed by the petitioners. Prior to respondent's audit in 1959, Rogan would ordinarily meet with the petitioners in their store after they had prepared the summary of information for preparation of their Federal tax return. Rogan would then take the summary sheet, the summary of sales prepared by Leona on the adding machine tape and the other data summarized by petitioners to his office and assemble the information in the form necessary to prepare the income tax return. Once the Federal income tax return was prepared and typed, Rogan would take to petitioners the tax return with the summary sheet and other data obtained from the petitioners. He never discussed the contents or details of the return with petitioners nor was he asked to do so. After the completion of an audit in 1955, Rogan, noticing the large balance in the petitioners' checking account, suggested to Abe that he transfer the portion of the funds not needed in the business *218 into interest bearing savings accounts, which Abe subsequently did. On June 8, 1959, petitioners were first contacted by the internal revenue agents in order to inventory any safe deposit boxes which the petitioners owned. They owned a safe deposit box at the Dollar Savings and Trust Company, Youngstown, Ohio, but respondent's agents were not permitted to inventory its contents. In 1947 Leona rented a safe deposit box at the Mahoning National Bank, Youngstown, Ohio, under the name of Mae Seeley, her middle and maiden name. Abe was named a deputy at the time the box was rented and signed the signature identification card. On June 8, 1959, after the initial conversation with the internal revenue agent, Leona entered her safe deposit box at 12:54 p. m. Petitioners did not inform the agents of the existence of the Mae Seeley safe deposit box until April 1961. On April 25, 1961, the examining agents inventoried this safe deposit box and found some Ohio Turnpike bonds which had been purchased after June 8, 1959, and some envelopes containing cash, which had been in the safe deposit box at the Dollar Savings and Trust Company until September 6, 1960. Many times in 1959 and 1960 *219 the revenue agent and special agent requested petitioners' books and records for 1955, 1956, 1957, and 1958. All requests were denied, usually on the advice of counsel. On February 6, 1961, the agents were given petitioners' cash and check disbursements records for 1956 through 1958. Several days later they were given the sales invoices for 1959. On or about March 6, 1961, the agents were given some of the sales invoices for 1956 through 1958. The agents recorded all the sales invoices, which were not in any alphabetical or chronological order, given to them. The total sales for the years 1956, 1957, and 1958, exclusive of sales tax, based on the invoices submitted, were as follows: Year
Amount
1956
$181,829.84
1957
160,330.62
1958
103,915.03
Net business receipts reported by petitioners on their Federal income tax returns were as follows: Year
Amount
1956
$180,449.44
1957
147,884.00
1958
116,644.00
The examining agents were informed that they had received on March 6, 1961, all the sales invoices for 1956, 1957, and 1958. However, in 1963, the internal revenue agent again contacted petitioners, after the 487 *220 intelligence investigation ended, to re-examine the sales invoices. At that time additional invoices were discovered totaling the following amounts: Year
Amount
1956
$21,397.84
1957
14,829.36
1958
23,899.03
Petitioners submitted to the examining agents an adding machine tape, purporting to be a tape of the 1957 invoices used for preparation of petitioners' 1957 income tax return. The agents compared the tape with the 1957 sales invoices and discovered invoices totaling $37,497.87 which could not be found on the tape. The agents compared the total gross receipts reported on petitioners' income tax returns with the total gross receipts reported on the Ohio sales tax returns for the years 1956, 1957, and 1958, and found only negligible variances. Respondent determined the business receipts of petitioners for the years 1950 through 1958 on the bank deposits method. The following schedule reflects respondent's determinations: 1950
1951
1952
Net Business Receipts Deposited
$154,692.69
$205,941.70
$163,209.85
Cash Expenditures from Business
6,000.00
6,000.00
6,000.00
Receipts
160,692.69
211,941.70
169,209.85
Business Receipts Reported on Income
156,969.60
177,672.00
144,840.67
Tax Return
3,723.09
34,269.70
24,369.18
Sales Tax Included in Receipts
1,123.50
1,075.00
1,380.50
Understatement of Business Receipts
$ 2,599.59
$ 33,194.70
$ 22,988.68
1953
1954
1955
Net Business Receipts Deposited
$180,745.87
$169,853.03
$167,538.57
Cash Expenditures from Business
6,000.00
6,000.00
7,857.93
Receipts
186,745.87
175,853.03
175,396.50
Business Receipts Reported on Income
179,492.70
148,395.14
160,680.68
Tax Return
7,253.17
27,457.89
14,715.82
Sales Tax Included in Receipts
3,784.50
4,048.50
4,628.60
Understatement of Business Receipts
$ 3,468.67
$ 23,409.39
$ 10,087.22
1956
1957
1958
Net Business Receipts Deposited
$186,354.48
$190,858.45
$153,366.93
Cash Expenditures from Business
8,456.23
7,234.50
5,680.32
Receipts
194,810.71
198,092.95
159,047.25
Business Receipts Reported on Income
180,898.44
148,621.00
117,323.95
Tax Return
13,912.27
49,471.95
41,723.30
Sales Tax Included in Receipts
5,213.05
4,260.04
2,983.61
Understatement of Business Receipts
$8,699.22
$45,211.91
$38,739.69
*221 Beginning with the year 1959, Rogan installed a double entry set of records including a general ledger, sales journal, check disbursements journal and cash receipts journal to which were posted the entries from the cash book maintained by Abe. All transactions were recorded on a month-to-month basis. Rogan also decided to install the double entry set of records on a retroactive basis to encompass the years 1955 through 1958 as well. In so doing, he utilized the books and records which he had obtained from the petitioners, including sales and purchase invoices. Rogan was not able to locate all invoices for the year 1955, but did record all the 1955 invoices which were available. The reconstruction of the sales journal for 1955, 1956, 1957, and 1958 was set up in such a manner that Rogan could check, cross-check, and doublecheck the sales invoices with the yellow account cards. Rogan also prepared a double-page 24-column journal which was bracketed for each of the years 1955, 1956, 1957, and 1958, divided into three columns for each year. The first column represented merchandise sales comprising the gross sales from the furniture 488 store operation reportable on the Federal *222 income tax return for each year, the second represented sales tax, which is not an income item, and, the third column consisted of a total of the first two columns. Rogan then placed the sales invoices in alphabetical order, typed in the names of the customers on the 24-column journal and personally went through each invoice and inserted the date of the invoice, the amount of merchandise sold, the sales tax, and the total of the invoice. To the right of these columns, Rogan made notations as to additional charges and credits on the sales invoices which were difficult to analyze for purposes of the columnar distribution. After analyzing and entering all the sales invoices, Rogan then doublechecked to insure that he had entered in the journals all sales reflected on the invoices. As a result of his review, Rogan determined additional items of sales marked on the sides and bottoms of several sales invoices which required corrections in the journals. Corrections were also required for credits allowed to customers for prompt payment and for additional charges made and entered on a prior sales invoice for a particular customer. Even though Rogan had made an analysis of each invoice on *223 his first analysis and entry in the sales journal, he located approximately 150 items on his review which required correction. At the end of the journal, there were four pages in which the entire journal was reviewed to find any omissions or corrections in posting of the details of the sales invoices for 1955 through 1958. In the process of reconstructing the petitioners' system of accounting to the double entry system, Rogan extracted from the sales invoices and account cards which were reviewed a group of sales invoices and account cards to show examples of the difficulty encountered in totaling invoices because of confusing and complicated entries on the invoices, the credits made to the account, extra computations and lump sum sales in which the sales price and Ohio sales tax charges were not separately detailed. To Rogan's knowledge, every sales invoice found at the Adlers' store is recorded in the journal reconstructing their books on the double entry system for part of the year 1955, and the years 1956, 1957, and 1958. After the sales invoices were journalized, Rogan arrived at the sales totals for each of the years 1956, 1957, and 1958. The totals of merchandise sales for *224 1956, 1957, and 1958 as recomputed on the double entry reconstruction of the single entry system was then compared with computations made by Leona and by Harold Bishop, another certified public accountant, as follows: Computation of Merchandise Sales
1956
1957
1958
By Leona Adler
$183,943.56
$151,638.73
$119,506.12
Less: Carpet Installation Adjustment
3,494.12
3,754.73
2,862.12
Net Amount
$180,449.44
$147,884.00
$116,644.00
By Harold Bishop, C.P.A.
$189,515.15
$159,839.37
$122,249.51
By John Rogan, C.P.A.
$200,723.46
$181,337.54
$138,890.24
In making the above comparison, Rogan obtained the 1956 gross sales figure prepared by Leona from the petitioners' income tax return for that year; the 1957 sales figure from the tape she had run for that year which was, after deduction of the carpet laying expense, the gross sales used for the income tax return for that year; and the 1958 gross sales figure from the income tax return for 1958. Bishop's computations of gross sales for the 3 years were obtained directly from the tapes which he had prepared in analyzing the sales invoices, whereas Rogan's computation was based on the *225 double entry reconstruction of the petitioners' single entry record system. Rogan prepared four sets of test analyses after completion of the journal reconstructing the petitioners' records on the double entry system of accounting to determine whether any omission or error had been made in his audit which might require further work in order to correctly determine gross sales of the petitioners for the years 1956, 1957, and 1958. The analysis between the account, hand credits, the cash book entries, the cash receipts, the sales invoice summary, an analysis in comparison of accounts, account cards with sales invoices, a test check analysis of check book entries, cash received on account, cash sales, deposits and their respective entry to the accounts receivable cards, resulted in his conclusion that the reconstructed journals reflected the net adjustment that was to be made to the petitioners' tax returns for 489 the years 1956, 1957, and 1958 for a correct determination of gross sales of merchandise. The journals for 1956, 1957, and 1958, reconstructing the petitioners' records on the double entry system of accounting from the records obtained by Rogan at the beginning of respondent's *226 investigation, were made available to the revenue agent. At no time after preparation of the journals for 1956, 1957, and 1958 and entry of the sales invoices obtained at the petitioners' office, did Rogan find any additional sales invoices for these years which were not entered in the journals. On the basis of reconstructing the single entry system into a double entry system for the years 1956, 1957, and 1958, Rogan prepared a reconciliation of the taxable income for such years as shown by the original returns with the taxable income as recomputed on the double entry system and determined from the original sales invoices, accounts receivable cards, checks and cash records. The results of such reconciliation indicated the following understatements of adjusted gross income: Per Return
Additions
Deductions
Corrected
Understate-
ment
1956
$18,317.51
$26,098.01
$ 5,882.01
$38,533.51
$ 20,216.00
1957
20,356.60
39,983.16
13,457.64
46,882.12
26,525.52
1958
11,636.00
27,250.21
2,792.83
36,093.38
24,457.38
Total
$71,198.90 Rogan determined that the understatements of taxable net income for *227 1956, 1957, and 1958 are based on the following individual items: 1956
1957
1958
(1) Merchandise sales orders pending
$11,312.11
$17,504.45
$11,458.45
at year end and com- pleted in
subsequent year
(2) Carpet installation expenses not
3,494.12
3,754.73
2,862.12
reported as gross receipts but
deducted as costs of sale
(3) 30-60-90 day sales considered as
($1,956.76)
$ 4,991.32
$ 2,601.01
"cash sales" ordered and delivered in
same year but not paid in full until
subse- quent year and sundry errors in
totaling merchandise sales
(4) Additional sales charges, credits
7,206.42
6,995.34
4,719.99
and adjustments on sales invoices
creating difficulty and confusion in
totaling amounts of sales
(5) Net understatement of costs of
(983.04)
(9,282.72)
1,588.35
sales and other expenses in totaling
costs and expenses
(6) Understatement of dividend income
35.57
121.02
121.02
(7) Understatement of interest income
1,107.58
2,441.38
1,106.44
Total
$20,216.00
$26,525.52
$24,457.38 When Rogan discovered the incorrect procedure used by Leona, he prepared an analysis of orders taken in one year with delivery made in *228 the following year in order to properly reflect merchandise sales for the years 1956, 1957, and 1958, resulting in the understatements of income. As a further result of this discovery, Rogan also filed an amended Federal income tax return for 1959 to reflect sales invoices dated in 1958 which he was of the opinion should be reported in 1959 because delivery and completion of the sale occurred in 1959. In the reconstruction of the petitioners' records for the period 1956 through 1958 and for the period from 1959 through 1962, Rogan's double entry set of records use the delivery date as the effective date of sale of merchandise by the petitioners. Based on Rogan's observations as a certified public accountant, the petitioners maintained a bookkeeping system known as the single entry set of records, which consisted of sales invoices, cash day books, purchase invoices, checkbooks and check stubs and a record of petty cash disbursements. Based on Rogan's expert opinion as a certified public accountant, the reconstructed records of the petitioners for the years 1956, 1957, and 1958 were adequate for the purpose of determining the corrected net 490 taxable income of the Adlers for *229 those 3 years. Based on Rogan's expert opinion as a certified public accountant, the books and records of the petitioners for the years 1959, 1960, 1961, and 1962, originally maintained on a double entry system of accounting and utilized to file their Federal income tax returns for such periods were adequate for the purpose of properly reporting taxable net income. Respondent's notice of deficiency determined the petitioners' taxable income for the years 1950 through 1958 on the bank deposits-expenditures method. Petitioners and respondent have agreed to and stipulated the majority of the figures from which a bank deposits-expenditures method determination of income can be prepared. From his analysis Rogan was of the opinion that the petitioners were reporting gross sales on their Federal income tax returns on the accrual method of accounting. Respondent's agent who made the examination of petitioners' income tax returns for 1956, 1957, and 1958 stated in his report that petitioners' income was determined on the accrual basis. The revenue agent who made the computation of petitioners' income on the bank deposits method as set forth in the deficiency notice for the years 1950 *230 to 1958, inclusive, included an estimated figure of $6,000 as "cash expenditures from business receipts" for the years 1950 through 1954 due to the absence of the day books showing petty cash expenditures for these years, which day books were available for all subsequent taxable years. In light of the respondent's use of an estimated figure of $6,000 for 5 successive years, Rogan prepared an analysis of petty cash payouts for the period 1956 through 1962 to arrive at a reasonable estimate for petty cash expenditures from business receipts for the period 1950 through 1954, for which period a record of the actual expenditures was not available. Such analysis was based upon comparison of the total actual petty cash payouts for the taxable years 1956 through 1962 compared to the total actual business receipts deposited for such period. Such percentage was then applied to the total business receipts deposited in each of the taxable years 1950 through 1954 to determine the petty cash expenditures from business receipts in each such taxable year. Rogan compared petty cash payouts with total business receipts (rather than the mere estimate set forth in respondent's deficiency notice) and applied *231 the average so determined to the actual business receipts for the years 1950 through 1954. Petitioners paid business expenses from cash receipts in each of the years 1950 through 1958 as follows: Year
Amount
1950
$3,048.81
1951
3,638.15
1952
3,411.81
1953
6,034.06
1954
6,162.49
1955
7,857.93
1956
8,456.23
1957
7,234.50
1958
5,680.32
In installing the double entry accounting records for the years 1959 and thereafter, Rogan prepared a list of accounts receivable from the yellow accounts receivable cards in order to determine the accounts receivable balance as of December 31, 1959. In 1962, Rogan discovered for the first time that the petitioners had always considered 30-60-90 day accounts as cash sales and that they had not prepared yellow account cards with respect to such customers, treating such sales, in all respects, as cash sales. This necessitated a correction in the accounts receivable balances shown on the general ledger for the 1959-1962 period, but, in no respect, affected the income reflected on the double entry set of books maintained as original records. Since respondent's bank deposits method of determining taxable income *232 for the period 1950 through 1958 did not include an accounting for accounts receivable, Rogan prepared a determination of accounts receivable balances for the entire taxable periods of 1950 through 1962 involved in the deficiency notices. By this means he made the bank deposits method for the years 1950 through 1958 comparable to the method used by respondent for the years 1959 through 1962, since he considered the reflection of accounts receivable to be proper, from accounting concepts, in order to properly reflect income on the bank deposits method of determining taxable net income. In the course of summarizing the complete set of journals which he had prepared on the double entry system for the years 1956 through 1962, Rogan found that all the cash receipts, with the exception of nominal amounts which were disbursed through petty cash, were deposited. Thus, the debits and credits for each period to 491 what would be the accounts receivable control as of December 31, 1962, could be recomputed back to December 31, 1955, for which complete records were available. Because the books and records were not complete or not available for the period 1950 through 1955, Rogan made a *233 computation of the petitioners' average markup on their cost of sales for the period 1956, 1957, and 1958, which resulted in an average gross markup determination of 45.689 percent. For the period 1959 through 1962, such average was 45.004 percent. He then applied this average gross markup figure of 45.004 percent to the cost of sales for each of the years 1950 through 1955 obtained from the tax returns to determine the gross sales for each of those years. The cost of sales for each of the years, obtained from the Federal income tax returns for the taxable years 1950 through 1955, was considered by Rogan to be substantially correct except for the cost of sales computation shown on the tax return for the year 1950. In reviewing the cost of sales figures on the Federal income tax return for 1950, Rogan noted the unusually high figure of $60,000 reflected for the closing inventory as of December 31, 1950. He discussed this figure with the petitioners who could not recall what this $60,000 figure was based upon. Abe indicated that their inventories were averaging $25,000 to $30,000 during this period and could not possibly have been as high as $60,000 because they did not have storage *234 facilities to maintain an inventory in that amount. Accordingly, Rogan, convinced that the petitioners could not possibly have had such a large inventory on the premises on December 31, 1950, and being disproportionate to inventories reflected for all other years, adjusted the inventory on a gross profit basis for the purpose of reconstructing accounts receivable for the years 1950, 1951, 1952, and 1953. The apparent discrepancy between the accounts receivable figures for 1959 through 1961 in the composite redetermination of accounts receivable for 1950 through 1962 and the figures in the general journal prepared by Rogan on the double entry system for 1959 through 1961, is accounted for by the fact that when the accounts receivable figures in the general journal were originally prepared, Rogan was unaware that the 30-60-90-day accounts were being treated as "cash," rather than "time," sales and not being entered on the yellow accounts receivable cards, resulting in an understatement of accounts receivable. This error was later corrected by adjusting entries and the correct amounts receivable figures appear on the composite schedule which was prepared subsequent to Rogan's discovery *235 with respect to the incorrect treatment of 30-60-90-day accounts by the petitioners. Respondent's computation of understatements of income on the bank deposits method, as set forth in the deficiency notice for the years 1959 through 1962, included opening and closing accounts receivable for each year. However, the computations for the years 1950 through 1958 did not include balances for opening and closing accounts receivable. The difference between the opening and closing balances of accounts receivable each year would have an effect on the bank deposits shown and the proper reflection of income. The accounts receivable balances on January 1 and December 31 for the years 1950 through 1962 were as follows: January 1
December 31
1950
$107,678.47
$132,294.33
1951
132,294.33
129,493.28
1952
129,493.28
124,398.79
1953
124,398.79
129,942.06
1954
129,942.06
120,105.65
1955
120,105.65
124,804.91
1956
124,804.91
132,989.58
1957
132,989.58
120,659.02
1958
120, 659.02
101,301.10
1959
101,301.10
105,645.32
1960
105,645.32
75,912.69
1961
75,912.69
62,005.85
1962
62,005.85
54,504.10
In addition to the differences involving *236 petty cash expenditures and accounts receivable balances, the petitioners' determination of income under the bank deposits method differs from respondent's computation in that petitioners accrued sales taxes payable in each of the taxable years 1950 through 1953, resulting from the Ohio sales tax deficiencies paid by them in 1954. The sales tax deficiencies determined were not contested. The costs of goods sold, as claimed on petitioners' returns and allowed in the notice of deficiency, were understated as follows: Year
Amount
1956
$ 983.04
1957
9,282.72 The cost of goods sold, as claimed on petitioners' return and allowed in the notice of deficiency, was overstated for the year 1958 in the amount of $1,588.35. During the years 1950 through 1958 the petitioners owned the following savings accounts: Account #X0140
Union National Bank
Youngstown, Ohio
Account #X5967
Union National Bank
Youngstown, Ohio
Account #X5742
Mahoning National Bank
Youngstown, Ohio
Account #X6507
Home Savings and Loan
Youngstown, Ohio
Account #X8291
Home Savings and Loan
Youngstown, Ohio
Account #X0474
Dollar Savings and Trust Co
Youngstown, Ohio
Account #XXXX
Dollar Savings and Trust Co
Youngstown, Ohio
Account #XXXX
Dollar Savings and Trust Co
Youngstown, Ohio
Account #X2649
Dollar Savings and Trust Co
Youngstown, Ohio
Account #X0468
The Farmers Savings and Loan Co
Canfield, Ohio
*237 Petitioners properly reported their correct interest income for the years 1950 and 1951 and overstated their correct interest income in 1952 by 38 cents. Petitioners had the following interest income realized on their savings accounts which was not reported on their respective income tax returns: Year
Amount
1953
$ 97.77
1954
339.92
1955
344.77
1956
1,107.58
1957
2,441.38
1958
1,106.44
On April 1, 1953, petitioners transferred $50,000 from their Union checking account to savings account No. X0140, Union National Bank. For the taxable year 1953, petitioners failed to report any interest credited to account No. X0474 during 1953, but reported instead the interest credited to that account on January 1, 1954. For the taxable year 1954, petitioners (a) failed to report any interest credited to account No. X0474 during 1954, but reported instead the interest credited to that account on January 1, 1955; (b) failed to report any interest credited to account No. XXXX in 1954; and (c) reported only a part of the interest credited in 1954 to account Nos. X5967, X0140, and X5742. On June 28, 1955, petitioners transferred $10,000 from their Union *238 checking account to savings account No. X0140, Union National Bank. On June 29, 1955, petitioners transferred $40,000 from their Union checking account: $20,000 to savings account No. X0474, Dollar Savings and Trust Co.; and $20,000 to savings account No. X5742, Mahoning National Bank. For the taxable year 1955, petitioners (a) failed to report any interest credited in 1955 to account Nos. X5967 and XXXX; and (b) reported only the interest for the last half of 1955 from account Nos. X5742 and X0140. On August 3, 1956, petitioners transferred $40,652.55 from savings account No. X0474 to savings account No. X2649, Dollar Savings and Trust Co. On August 9, 1956, petitioners transferred $50,000 from their Union checking account to savings account No. X5967, Union National Bank. On October 19, 1956, petitioners transferred $9,762.25 from savings account No. X6507, to savings account No. X8291, Home Savings and Loan. On November 11, 1956, petitioners transferred $32,459.26 from savings account No. X5742, Mahoning National Bank, to savings account No. X8291, Home Savings and Loan. For the taxable year 1956, petitioners (a) failed to report any interest credited in 1956 to account *239 Nos. X5967, X0474, and XXXX; (b) reported only the interest for the last half of 1956 from account Nos. X5742 and X0140; and (c) reported all the interest credited in 1956 to account No. X2649 as of January 1, 1957, on their 1956 return. On August 5, 1957, petitioners transferred $25,000 from their Union checking account to savings account No. X8291, Home Savings and Loan. On September 30, 1957, petitioners transferred $1,447.90 from savings account No. XXXX to savings account No. XXXX, Dollar Savings and Trust Co. The Union National Bank sent Abe a Form 1099, U.S. Information Return for Calendar Year 1957, reflecting total interest paid in the amount of $2,302.64; only $1,157.05 was reported on petitioners' 1957 return. The Home Savings and Loan sent Abe a Form 1099 for 1957 reflecting total interest paid of $1,645.89; only $996.57 was reported on petitioners' 1957 return. For the taxable year 1957, petitioners (a) failed to report any interest credited in 1957 to account No. XXXX; and (b) reported only the interest for the last half of 1957 from account Nos. X2649, X5967, X0140, and X8291. In 1958 petitioners transferred $37,000 from their Union checking account as *240 493 follows: On June 30, 1958, $20,000 to savings account No. X8291, Home Savings and Loan; on August 11, 1958, $10,000 to savings account No. X0468, Farmers Savings and Loan; and on September 18, 1958, $7,000 to savings account No. X8291, Home Savings and Loan. In the taxable year 1958 the petitioners failed to report any interest credited to account Nos. X5967 and XXXX. Abe bought shares of National Fuel Gas in the name of Mae Seeley in the 1930's and gave them to her. Petitioners realized the following income from dividends which was not reported on their respective income tax returns: Year
Amount
1956
$ 35.57
1957
121.02
1958
121.02
Petitioners deducted certain medical expenses on their income tax returns which were disallowed by respondent in the notices of deficiencies. The parties agree that the deductions are allowable, subject to the limitation provisions of section 213, Internal Revenue Code of 1954, as follows: Year
Amount
1958
$449.40
1959
662.20
1960
662.20
1961
596.20
1962
596.20
The total cash receipts of petitioners for the years 1959 The total cash receipts of *241 petitioners for the years 1959 through 1962 were as follows: Year
Amount
1959
$150,770.30
1960
162,548.54
1961
126,233.31
1962
122,381.78
Ultimate Findings 1. For the years 1950 through 1962 the petitioners elected and reported income from the Adler Furniture Company on the accrual method of accounting. They did not change as of January 1, 1959, their method of accounting from the cash to the accrual basis. 2. The petitioners had the following understatements or overstatements of taxable net income for the years 1950 through 1962: Taxable Years
Understatement
or (Overstatement)
of Taxable Income
1950
$21,224.38
1951
24,346.23
1952
12,904.42
1953
8,661.42
1954
14,075.39
Taxable Years
Understatement
or (Overstatement)
of Taxable Income
1955
$15,131.25
1956
17,044.00
1957
26,161.03
1958
22,197.58
1959
2,134.12
1960
(2,844.15)
1961
1,648.73
1962
(2,429.07) Such amounts of understatement are limited to the lesser amounts alleged and set forth in the notice of deficiency for the year 1950 in the amount of $4,150.28, for the year 1953 in the amount of $8,296.98, *242 and for the year 1956 in the amount of $15,584.43. 3. At least a part of the deficiency or underpayment of tax by the petitioners for each of the years 1950 through 1958 was due to fraud with intent to evade tax, and each of their Federal income tax returns for those years was a false and fraudulent return with intent to evade tax. 4. Petitioners substantially underestimated their estimated income tax for the years 1952 and 1954. Opinion We are faced with a long, tedious, and complex record which makes our task difficult in these consolidated cases. For simplification, we will discuss the various issues in the order previously stated. Issue 1 - Motion to Strike Paragraph 9(a)(4) of Respondent's Answer In Docket No. 700-66 the taxable net income of petitioners set out in the deficiency notice was determined for the years 1950 through 1958 on the bank deposits-expenditures method. In support of the additions to tax under section 293(b) of the 1939 Code, respondent in his answer affirmatively alleged facts to support the penalties based on the bank deposits and expenditures method. Also in support of such fraud penalties the respondent affirmatively alleged alternatively *243 an understatement determined on the net worth and expenditures method. In addition, respondent alleged in paragraph 9(a)(4) of his answer an increase in the income tax deficiencies for the years 1950, 1951, 1953, 1955, and 1956 based on the alternative net worth and expenditures method. At the trial petitioners filed a motion to strike paragraph 9(a)(4) of the answer on the ground that the affirmative allegations therein are erroneous and not in accord 494 with the reasons set forth in our opinion in William Prizep, 18 T.C.M. 274 (1959). In that case we held that where the Commissioner determines deficiencies in a fraud case under one method in his notice of deficiency and argues alternatively in his answer for deficiencies under another method if it will result in larger deficiencies than the method set forth in the deficiency notice, this Court will decide the deficiencies and fraud issue on the basis contained in the Commissioner's deficiency notice. In so holding we said: Respondent in his brief submits that our Court should decide this case on the basis of the specific adjustments which respondent has made in his deficiency notices. However, he contends that *244 in the event the unreported income under the specific adjustments does not equal or exceed the unreported income under the net worth method, then the net worth method should be employed in determining the amount of the deficiencies. It is our opinion that we should decide this case on the issues raised by the pleadings as to the various adjustments made by respondent in his deficiency notices to the net income as reported by petitioners on their returns. * * * Yet respondent, in effect, would have us make some kind of an estimate; if we came to the conclusion that the deficiencies would be less under our holdings on the adjustment method used by respondent in his deficiency notices than they would be under respondent's net worth computation, he would have us, in effect, scrap what we have already done and take up the case and decide it under the net worth method. We know of no warrant for that kind of procedure in the Tax Court and we shall not follow it here. We have made no Findings of Fact on the net worth method urged by respondent as an alternative in the manner aforesaid. To do so would serve no useful purpose and would only prolong unduly this report. For reasons we have *245 already indicated, we think this case should be decided on the issues raised as to the adjustments made by the Commissioner in his deficiency notices and which still remain in dispute, after the elimination of other issues which have been settled by agreement between the parties. The parties here are in agreement that the use of the bank deposits-expenditures method is best in these cases. The major dispute is with respect to three items affecting the determination of income on that method. We agree that the bank deposits method is the proper way to determine the correct amount of the deficiencies. We choose to use such method in deciding these cases. [1] We have not relied on the net worth computation in redetermining the deficiencies. However, petitioners acknowledge, and we agree, that the respondent's net worth computation, which reflects a somewhat similar understatement of income, may be used for the limited purpose of corroborating the allegation of fraud. Therefore, in order to clarify the record, the petitioners' motion to strike paragraph 9(a)(4) of the respondent's answer, which was tentatively denied in its entirety at the commencement of the trial, is now granted insofar *246 as it affects the redetermination of the deficiencies. Issue 2 - Method of Accounting This is a factual question. As our ultimate findings indicate, we think the petitioners have proved by a preponderance of the evidence that their taxable income for the years 1950 through 1962 was computed under the method of accounting regularly used to compute their income in keeping their books, i.e., the accrual method. Thus, they did not and could not have changed to the accrual method in 1959 since the evidentiary facts show that they were never on a method of *247 accounting other than the accrual basis. There are several reasons to support the conclusion that the petitioners were on the accrual basis of accounting. They are: 1. Their income tax returns for the years 1950 through 1962 include on the attached business income schedules the use of inventories in computing cost of goods sold, which generally requires use of the accrual method. See section 1.446-1(c)(2)(i), Income Tax Regs.; Charles F. Bennett, 30 T.C. 114, 121 (1958), and cases cited therein. 495 2. Books and records are important in determining whether the taxpayer is on the cash or accrual method. Russell v. Commissioner, 45 F. 2d 100 (C.A. 1, 1930). Rogan, the petitioners' certified public accountant and expert witness, made a thorough examination of the books and records and concluded that the accrual method of accounting was used for all years involved. 3. Respondent's agents on a prior audit for 1953 determined that petitioners were on the accrual basis. And revenue agent Ross admitted on cross-examination that he prepared the bank deposits and expenditures determination set forth in his report reflecting sales *248 on the accrual basis. 4. Leona testified that she included sales made on credit, and relative to which an unpaid balance existed at the end of the year along with cash sales, in determining gross sales for income tax purposes; and that merchandise purchases included all purchases for a given year whether the purchase invoice had been paid or not. Respondent relies on the internal change of petitioners' bookkeeping system from the single entry to the double entry system commencing for their taxable year ended December 31, 1959, as the key fact evidencing a change of accounting method. This ignores the fact that such modification had no basic effect whatever on the manner in which petitioners reported their taxable income. Its only significance was to create a set of books and records which with greater facility reflect the various categories of items necessary for preparing their income tax returns. Prior to installation of the change in 1959, the petitioners were maintaining their records on the single entry system, but accrual method; afterwards, the records were maintained on the double entry system and, as before, on the accrual method. Even respondent admits that because of *249 the substantial charge sales and inventories "an accrual method is advisable." Accordingly, we hold for petitioners on this issue. We conclude that there was no change in their method of accounting to the accrual basis as of January 1, 1959, without the consent of the Commissioner. Issue 3 - Determination of Taxable Income The parties have stipulated most of the items necessary to determine petitioners' taxable net income for the years 1950 through 1962. The disagreement between them relating to the use of the bank deposits and expenditures method of determining income involves three separate and distinct issues, namely: (1) The correct determination of petty cash expenditures for the years 1950 through 1954; (2) Whether opening and closing accounts receivable balances should be reflected on the bank deposits-expenditures computation for the years ended December 31, 1950, through December 31, 1958; and if so, the correct amounts thereof; and (3) Whether the $11,023.61 Ohio sales tax deficiency, involving the years 1949 through 1953 and paid in 1954, should be deducted in the year paid or the years in which the liabilities accrued. Petty Cash Expenditures The day books *250 maintained by petitioners which reflected petty cash expenditures for the years 1950 to 1954, inclusive, were not available at the time of the examination by respondent's agents. The day books for the taxable years 1955 through 1962 were available. Accordingly, in order to determine the income of petitioners on the bank deposits-expenditures method for the years 1950 through 1954, and place the computation for these years on a basis comparable to the subsequent years, the respondent, in Exhibit A attached to the deficiency notice and in Exhibit DD. estimated the petty cash expenditures in the amount of $6,000 for each of these years. Petitioners, on the other hand, determined the average of the petty cash expenditures for the subsequent taxable years for which the day book records were available, as compared to total bank deposits for the subsequent years, and applied a percentage rate of 1.2446 percent to the total bank deposits for the years 1950 to 1954, inclusive. On the basis of this computation, the petty cash expenditures for the years for which the day books were not available were computed as follows: Year
Amount
1950
$3,048.81
1951
3,638.15
1952
3,411.81
1953
6,034.06
1954
6,162.49
*251 Admittedly, neither recomputation can be claimed as precisely accurate. However, the computation of petitioners does equate the expenditures with bank deposits based on a subsequent historical record of expenditures. Petitioners' computation gives 496 effect to the reality that bank deposits were less in the early years involved in this proceeding. The petty cash expenditures used by respondent for the years 1950 through 1954 were mere estimates - presumably based, in general, on the actual expenditures for subsequent years when, as a whole, bank deposits were higher in amount than the earlier years for which the records were not available. Of the two methods, we believe the petitioners' computation is more accurate and their figures for petty cash expenditures for such years have been included in our findings of fact. Opening and Closing Accounts Receivable Balances In view of our determination that the petitioners reported their income on the accrual basis of accounting, it is apparent that the failure of respondent to include an adjustment for the difference in opening and closing yearly balances of petitioners' accounts receivable for the years 1950 through 1958 results *252 in a distortion of taxable income. In addition, it is necessary to determine the correct accounts receivable balances in order to clearly reflect income on the bank deposits and expenditures method for each of the years 1950 to 1962, inclusive. It is evident that the differences between the accounts receivable computations of petitioners and respondent are substantial. We have set out in our findings of fact the method and steps used by Rogan, the petitioners' accountant, to determine the correct amounts of accounts receivable balances. We need not repeat them. Suffice it to say that we do not dismiss summarily, as respondent urges us to do, the conscientious, time-consuming effort of Rogan to obtain a logical, accurate determination of accounts receivable from all available information. The principal objection of respondent to the analysis is that it conflicts with the books and records and with the physical count of receivables made by respondent's agents for 1957 and 1958. Respondent fails to explain, however, that the alleged conflict with the books and records, as well as the inaccuracies of the agent's tabulations of accounts receivable for 1957 and 1958, is highlighted by the *253 omission of 30-60-90 day accounts from their totals. Respondent also argues that the petitioners have understated their gross business receipts for the years 1959 and 1960, and overstated their gross business receipts for the years 1961 and 1962. The underlying basis behind the computations arriving at these understatements and overstatements is the computation of accounts receivable as of December 31, 1958, which figure was determined by respondent's examining agents. Here again, we note that the agent who prepared the December 31, 1958, accounts receivable balance testified that such calculations failed to take into account the 30-60-90 day charge accounts which the petitioners had treated as cash sales. We think respondent's figures are incorrect by the admission of his own agents. Rogan, the petitioners' accountant, did not discover the method by which the petitioners treated such 30-60-90 day accounts until 1962. Upon discovery of this fact, he corrected the books and records to reflect the proper treatment of accounts receivable. Exhibit 68 represents such a determination. The efforts of respondent on brief to exploit the difference between the figures in Exhibit 68 and the *254 books and records for 1959 through 1962 is an obvious smokescreen. The differences are the result of necessary corrections of the 1959 through 1962 books and records to accurately reflect the correct balance of accounts receivable on the basis of information obtained by Rogan in 1962. Exhibit 68 determines accounts receivable on two bases, as Rogan explained on cross examination. One computation determines accounts receivable by including net receivables for incompleted sales, and the other computation - relied on by petitioners as their determination of the correct amounts receivable balances - determines accounts receivable balances by excluding net receivables for incompleted sales at year end and including any deposits made on such incompleted sales. Respondent questions whether this latter method is the correct manner in which to account for accounts receivable, citing Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934). The general rule with respect to accrual basis taxpayers is that gain on a sale is ordinarily taxed when the purchaser is unconditionally liable to pay the purchase price. This basic definition was paraphrased in Spring City Foundry Co. v. Commissioner, supra, at page 184, *255 where the Supreme Court stated: When the right to receive an amount becomes fixed, then the right accrues. When a merchandising concern makes 497 sales, its inventory is reduced and a claim for the purchase price arises. This case sets forth the very exception which petitioners claim. The orders did not become sales until the petitioners ordered the furniture, received it, and delivered it to the customer, at which time a reduction of their inventory took place. Respondent's attempt to create an enforceable account receivable at the time the purchaser orders unstocked good defies logic. The petitioners had no legally enforceable right to receive the balance due on an order until after the furniture had been ordered and received by them and delivered to the purchaser. Respondent's final argument that the failure of petitioners to introduce testimony as to the custom in the retail furniture business on this question "should weight heavily against petitioners" is without merit. Petitioners' position is based on generally accepted legal principles of sales law and not on some hidden idiosyncrasy indigenous to the retail furniture business. We are satisfied that petitioners' *256 computation is not only logical, but entirely consistent and reasonably accurate for the taxable years 1950 through 1962, and, accordingly, should be permitted to stand as the correct determination of accounts receivable for each year. Ohio Sales Tax Deficiency During the year 1954 the petitioners paid an Ohio sales tax deficiency for the taxable years 1949 through 1953. The deficiency resulted from an examination of sales tax liabilities when Abe found out that the method being followed in collecting and reporting the Ohio sales tax liabilities was not correct. The deficiency was not contested. Respondent allowed the total sales tax deficiency ($11,023.61) in the year 1954 on the ground that petitioners were reporting their income on the cash basis of accounting. Petitioners contend that the deficiency is allocable to and deductible in the years for which the deficiency was asserted as follows: Year
Amount
1950
$3,039.88
1951
3,685.57
1952
2,401.20
1953
1,117.31
This contention is, of course, based on the fact that petitioners were reporting on the accrual basis. Since the deficiency was not contested, cf. Dixie Pine Products Co. v. Commissioner, 320 U.S. 516 (1944), *257 and Security Flour Mills Company v. Commissioner, 321 U.S. 281 (1944), and the petitioners were on the accrual basis of accounting, the sales tax deficiency should be allocated to the years to which the deficiencies relate in order to clearly reflect the taxable income of petitioners on the bank deposits and expenditures computation contained in Exhibit 71. Dravo Corp. v. United States, 348 F. 2d 542 (Ct. Cls. 1965); Standard Paving Co. v. Commissioner, 13 T.C. 425 (1949), affd. 190 F. 2d 330 (C.A. 10, 1951). Therefore, we agree with petitioners. Issue 4 - Additions to Tax for Fraud Symptomatic of the gulf between the parties is the fraud question. Did the petitioners file false and fraudulent Federal income tax returns for the years 1950 through 1958? We think they did. In our judgment the respondent has presented clear and convincing evidence of fraud. We have found on the evidence presented that the petitioners substantially understated their gross income in each of the 9 years for which fraud is alleged. This is vividly illustrated by the following comparison between the income reported on their tax returns and the understatements *258 of income established by the evidence: Year
Income Reported
Understate-
on Tax
ment of Income
Return
1950
$ 15,122.84
$ 21,224.38
1951
17,561.74
24,346.23
1952
13,034.63
12,904.42
1953
18,056. 05
8,661.42
1954
17,731.99
14,075.39
1955
17,939.90
15,131.25
1956
18,317.51
17,044.00
1957
20,356.60
26,161.03
1958
11,636.00
22,197.58
Total
$149,757.26
$161,745.70 In other words, over the 9-year period the petitioners understated their taxable income by $161,745.70 - more than 100 percent of the taxable income reported on their returns. This consistent pattern of substantial understatements in each and every year for 9 consecutive years clearly shows the scienter - the intent to evade tax. Where, as here, large amounts of income are consistently and repeatedly omitted from tax returns, and the explanation for such omissions is patently weak or incredible, then the conclusion is inescapable that the 498 taxpayers intended to understate their true income. See M. Rea Gano, 19 B.T.A. 518 (1930); Estate of Joseph Nitto, 13 T.C. 858 (1949); Rogers v. Commissioner, 111 F. 2d 987 (C. *259 A. 6, 1940), affirming 38 B.T.A. 16 (1938); Manos v. Commissioner, 187 F. 2d 734 (C.A. 6, 1951); Reash v. Commissioner, 218 F. 2d 954 (C.A. 6, 1954), affirming per curiam a Memorandum Opinion of this Court; Kurnick v. Commissioner, 232 F. 2d 678, (C.A. 6, 1956), affirming a Memorandum Opinion of this Court; Bollella v. Commissioner, 374 F. 2d 96 (C.A. 6, 1967), affirming a Memorandum Opinion of this Court; and Boschma v. Commissioner, 374 F. 2d 863 (C.A. 6, 1967), affirming a Memorandum Opinion of this Court. We are satisfied on this record that the understatements were deliberate and fraudulent. The reasons suggested by petitioners, i.e., ineptness, negligence, confusion and an antiquated record and filing system, are not convincing. Petitioners were not inept in operating their furniture business. It was a very profitable business. They were not inept in recording and accounting for their expenses and deductions. Expenses were carefully recorded, classified into deductible categories and verified against the day books. The meticulous manner in which cash transactions were recorded refutes their claim of *260 ineptness. Nor can the understatements of gross business receipts be ascribed to "lack of book-keeping knowledge, ignorance, and poor judgment." They were completely familiar with their records. They used and reviewed them to determine sales for sales tax, property tax, income tax and to follow up on delinquent accounts. In addition to the understatements of gross business receipts, the petitioners also understated their interest income in each year from 1953 through 1958. These understatements were not small or sporadic, but substantial and consistent. In each of the years 1956, 1957, and 1958 the understatement exceeded $1,000. Petitioners were aware that interest was taxable because they had properly included all of their interest in previous years. They did not just forget about the existence of their savings accounts. During the years 1955 through 1957 they transferred large sums of money from checking accounts to savings accounts. There is no logical explanation for what the petitioners did. For the years 1954 through 1958, both semiannual interest credits from some savings accounts were fully reported, while only half was reported from others. In some instances no interest *261 from a particular account was reported. Even in this regard there was inconsistency because all the interest from a particular account would be reported in one year, but only part of the interest from that same account would be reported in another year. The same is true with respect to those accounts for which the savings passbooks were stolen. In 1956, for example, half the interest was reported for account Nos. X5742 and X0140. When all this is considered with the continuing deposits of large sums into these accounts and the receipt of Forms 1099, it is hard to escape the conclusion that the understatements of interest were deliberate. On their tax returns for 1950 through 1955 the petitioners reported their correct dividend income, which ranged from $339 to $672. In 1956, 1957, and 1958 erroneous amounts were reported. While the amounts of the dividend understatements, standing alone, are relatively small, when they are considered along with the other facts present here, the pattern is clear. The dividend omissions were likewise deliberate and fraudulent. We think the petitioners were well aware of their tax obligations. They regularly purchased sales tax stamps and affixed *262 these stamps to customer payment books, noting it on the invoice by a small dot. Twice a year they filed sales tax returns. They also filed personal property tax returns and the required employer's returns. The conduct of petitioners during the course of the audit by the Internal Revenue Service indicates that the petitioners knew they had been fraudulent. On June, 1959, the revenue agents contacted petitioners to inventory their safe deposit boxes. The appointment made for that afternoon to inventory the box at the Dollars Savings and Trust Company was cancelled. The agents were not permitted access to that box. Furthermore, petitioners failed to reveal the existence of the safe deposit box owned in the name of Mae Seeley, the middle and maiden name of Leona Adler, although they both knew about it. That same afternoon, after cancelling the appointment, Leona entered her safe deposit box. It is, of course, impossible to know what was 499 contained therein in June 1959. However, when the existence of this box was revealed and inventoried 2 years later, it contained only items that could not have been there in 1959, i.e., Ohio Turnpike bonds acquired in 1960 or later and envelopes *263 containing cash, placed in the box in September 1960. In March 1961, when the revenue agents were permitted access to the sales invoices, only part of the invoices were submitted, the total of which approximated the gross receipts reported on the tax returns for 1956, 1957, and 1958. Not until 1963 were additional invoices, totaling nearly $60,000. made available to the agents. By that time the criminal phase of the investigation had been completed. Accordingly, we conclude, and have so found as an ultimate fact, that the petitioners filed false and fraudulent income tax returns for each and every year from 1950 through 1958 with intent to evade their Federal income taxes. Issue 5 - Statute of Limitations Having determined that a part of the deficiency in each of the years 1950 through 1955 was due to fraud with intent to evade tax, it follows that the assessment of deficiencies for such years is not barred by the statute of limitations. See section 276(a), Internal Revenue Code of 1954; and section 6501(c)(1), Internal Revenue Code of 1954. The years 1956 through 1958 are open for assessment of deficiences by written consent *264 of petitioners. Issue 6 - Addition to Tax Under Section 294(d)(2) Respondent determined additions to tax of $864.05 in 1952 and $908.10 in 1954 under section 294(d)(2), Internal Revenue Code of 1939, for substantial underestimation of estimated tax. We have found that a part of the deficiency for each of these years was due to fraud with intent to evade tax and therefore the addition to tax for each year is not barred by the statute of limitations. Petitioners have not submitted any evidence on this issue and have not satisfied their burden of proof. Based upon the deficiencies redetermined for these years, the correct amounts of the additions to tax can be computed and given effect in the Rule 50 computations. * * * To permit all the necessary computations required of the parties to arrive at decisions in both dockets reflecting the concessions made by them and the conclusions reached in this opinion, Decisions will be entered under Rule 50. Footnotes
1. In his original brief respondent stated: If the Court believes the bank deposit computation is the proper way to determine the correct amounts of deficiencies, it would, of course, require a Rule 50 computation based on the bank deposits method and enter a decision in accordance therewith. On the other hand, and in view of the evidence submitted, respondent recognizes the possibility that the Court might be of the opinion that the net worth computation most clearly reflects the petitioners' understatements of income. The Court should then request a Rule 50 computation based on the determined "net worth" understatements.↩